UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

IN DEFENSE OF ANIMALS,

    Plaintiff,

      v.

NATIONAL INSTITUTES OF HEALTH
AND U.S. DEPARTMENT OF HEALTH
AND HUMAN SERVICES,

    Defendants.

Civil Action No. 04-1571 (CKK)

**MEMORANDUM OPINION**
(December 12, 2007)

This Freedom of Information Act ("FOIA") case was brought against the National

Institutes of Health and U.S. Department of Health and Human Services (collectively, "NIH") by

In Defense of Animals ("IDA") seeking information related to approximately 260 chimpanzees

located as the Alamogordo Primate Facility ("APF") in New Mexico.  On March 31, 2007, the

Court issued an Order granting in part and denying in part the Parties' Cross-Motions for

Summary Judgment that, *inter alia*, required NIH to search APF for clinical chimpanzee files and

to release certain other previously-withheld documents.  *See* [22] Order dated March 31, 2007 at

1-2.  NIH filed the instant Motion for Partial Reconsideration of that Order on April 18, 2007.

After reviewing both Parties' submissions and the attachments thereto, applicable statutory

authority, relevant case law and the entire record as a whole, the Court shall DENY Defendant's

Motion for Partial Reconsideration for the reasons that follow.

**I. BACKGROUND**

The Court presumes knowledge of the facts of this case, which are described more

comprehensively in the Court's [23] Memorandum Opinion dated April 2, 2007.  By letter dated January 20, 2004, IDA submitted a FOIA request to NIH's component, the National Center for Research Resources ("NCRR"), for documents relating to chimpanzees located at APF.  *See* Compl. Ex. 1 (FOIA Request).  APF is a government-owned and contractor-operated facility in New Mexico.  *Id.*  The chimpanzees located at APF are owned by NIH and are maintained under a contract with Charles River Laboratories, Inc. ("CRL"), a publicly held animal research company.  *Id.*  By letter dated March 5, 2004, NIH agreed to send IDA "all material consistent with the exemptions recognized by the FOIA," and explained that its disclosures would follow HHS's policy of "expung[ing] confidential commercial or financial information, evaluative material, EIN numbers, and personal information such as social security numbers, individual salaries and names of and identifying information about staff who are not listed as key personnel on the contract."  *Id.* Ex. 5 at 1 (NIH's Response to IDA's FOIA Request dated March 5, 2004). NIH released documents to IDA on a rolling basis beginning July 23, 2004, with subsequent disclosures made in November 2004 and January 2005.  *Id.* Ex. 6 (NIH's Partial Response to IDA's FOIA Request dated July 23, 2004); Defs.' Mot. for Part. Summ. J. Ex. A (NIH's Letters dated Nov. 5, 2004; Nov. 29, 2004; and Jan. 11, 2005).  IDA filed a Complaint with this Court on September 10, 2004, seeking documents that NIH withheld from disclosure.

The Court granted in part and denied in part the Parties' Cross-Motions for Summary Judgment on March 31, 2007.  The Court's Order required NIH, in relevant part, to (1) search the APF facility for requested documents, (2) release documents related to answers submitted to NIH by CRL as part of its contract proposal to manage the APF chimpanzee facility, and (3) release redacted information providing the square footage of APF, daily inventories of animals, floor

plans and wiring diagrams, specific locations of individual animals, locations of animal records

and specimens, numbers of rooms containing equipment, the numbers of animals in specific

holding areas, and the square footage of specific areas. *See* [22] Order dated March 31, 2007 at 2

(hereinafter, the "Order").  NIH sought reconsideration of each of these areas in the instant

Motion filed on April 18, 2007 (hereinafter, "Defs.' Mot. for Part. Recons.").  IDA filed an

Opposition on May 7, 2007, and NIH filed a Reply on May 17, 2007.

## II. LEGAL STANDARD

Fed. R. Civ. P. 54(b) is the appropriate basis under which a party can bring a motion to

reconsider dismissed claims when fewer than all claims in an action have been dismissed.

Pursuant to Rule 54(b),

> any order or other form of decision, however designated, which
> adjudicates fewer than all the claims or the rights and liabilities of
> fewer than all the parties shall not terminate the action as to any of
> the claims or parties, and the order or other form of decision is
> subject to revision at any time before the entry of judgment
> adjudicating all the claims and the rights and liabilities of all the
> parties.

Accordingly, without express direction for the entry of judgment on particular claims

under Rule 54(b), court action which terminates fewer than all claims in a case is considered an

interlocutory rather than a final decision and subject to revision at any time. *See also Hill v.*

*Henderson*, 195 F.3d 671, 672 (D.C. Cir. 1999) (holding that a district court order dismissing one

of several claims without making an explicit determination under Rule 54(b) is not a final

decision subject to appellate review); *Lewis v. United States*, 290 F. Supp. 2d 1, 3 (D.D.C. 2003)

(stating that a motion to reconsider dismissal of claims related to one of two parties was properly

brought under Rule 54(b) rather than Rule 60).  Although the Parties disagree as to the proper

3

standard of review in the instant case, the Court's Order was not a final judgment.  The Court

required NIH to search for, and subsequently release, documents at a later date.  The Parties were

instructed to file a Joint Status Report with the Court concerning these additional documents.

Because these outstanding issues required resolution prior to entry of a final judgment, Fed. R.

Civ. P. 54(b) provides the proper standard of review for NIH's Motion.

       The Court has broad discretion to hear a motion for reconsideration brought under Rule

54(b):  "Unlike Rule 60(b) which contains a reasonableness provision, Rule 54(b) allows a court

to reconsider its interlocutory decisions 'at any time' prior to a final judgment."  *Lewis*, 290 F.

Supp. 2d at 3 (quoting Rule 54(b)).  The standard for determining whether or not to grant a

motion to reconsider brought under Rule 54(b) is the "as justice requires" standard espoused in

*Cobell v. Norton*, 355 F. Supp. 2d 531, 539 (D.D.C. 2005), which requires "determining, within

the Court's discretion, whether reconsideration is necessary under the relevant circumstances."

*Id.  See also Singh v. George Washington University*, 383 F. Supp. 2d 99, 101 (D.D.C. 2005).

Considerations a court may take into account under the "as justice requires" standard include

whether the court "patently" misunderstood the parties, made a decision beyond the adversarial

issues presented, made an error in failing to consider controlling decisions or data, or whether a

controlling or significant change in the law has occurred.  *See Singh,* 383 F. Supp. 2d at 101.

Furthermore, the party moving to reconsider carries the burden of proving that some harm would

accompany a denial of the motion to reconsider:  "In order for justice to require reconsideration,

logically, it must be the case that, some sort of 'injustice' will result if reconsideration is refused.

That is, the movant must demonstrate that some harm, legal or at least tangible, would flow from

a denial of reconsideration."  *Cobell*, 355 F. Supp. 2d at 540.

*Cobell* also suggests that even if justice does not "require" reconsideration of an interlocutory ruling, a decision to reconsider is nonetheless within the court's discretion: "[E]ven if the appropriate legal standard does not indicate that reconsideration is warranted, the Court may nevertheless elect to grant a motion for reconsideration if there are other good reasons for doing so." *Id.* at 540. However, the efficient administration of justice requires that a court at the very least have good reason to reconsider an issue which has already been litigated by the parties: "'The district court's discretion to reconsider a non-final ruling is, however, limited by the law of the case doctrine and "subject to the caveat that where litigants have once battled for the court's decision, they should neither be required, nor without good reason permitted, to battle for it again."'" *Singh*, 383 F. Supp. 2d at 101 (quoting *In re Ski Train Fire in Kaprun, Austria, on November 11, 2004*, 224 F.R.D. 543, 546 (S.D.N.Y. 2004)). Thus, if the court chooses to reconsider a motion even if justice does not so require, there must be a "good reason" underlying the parties' re-addressing an already decided issue.

### III. DISCUSSION

#### A.    *Documents Located at the APF Facility*

The Freedom of Information Act requires federal agencies, in responding to a request for information, to: (1) conduct an adequate search for that information through reasonable efforts; (2) provide the information to the requester, unless it falls within a FOIA Exemption; and (3) provide to a requester any information that can reasonably be segregated from the exempt information. 5 U.S.C. §§ 552(a)(3), 552(b). Although NIH acknowledges that APF houses records requested by IDA, *see* Defs.' Mot. for Part. Recons. at 8 ("[t]he clinical chimpanzee records are located at APF"), NIH argues that such records are not "agency records" because they

belong to NIH's contractor, CRL, *id.* ("the clinical files . . . belong to the animal care provider, [CRL]").

To constitute "agency records," the documents must meet the two criteria set forth in *United States Dep't of Justice v. Tax Analysts*:  "First, an agency must 'either create or obtain' the requested materials . . .  Second, the agency must be in control of the requested materials at the time the FOIA request is made."  492 U.S. 136, 144-145 (1989).  The second of these criteria, "control," is examined using the four-factor test set forth in this Circuit's *Burka v. U.S. Dep't of Health and Human Services*, 87 F.3d 508, 515 (D.C. Cir. 1996) (quoting *Tax Analysts v. Dep't of Justice*, 845 F.2d 1060, 1069 (D.C. Cir. 1988)):

> 1) the intent of the document's creator to retain or relinquish control over the records; (2) the ability of the agency to use and dispose of the record as it sees fit; (3) the extent to which agency personnel have read or relied upon the document; and (4) the degree to which the document was integrated into the agency's record system or files.

As the Court highlighted in the Opinion accompanying its Order, NIH owns the APF facility where the requested documents are located.  *See* Mem. Op. dated April 2, 2007 at 24.  NIH owns the chimpanzees located at APF.  *Id.*  When NIH gained ownership of the chimpanzees in 2000, it also obtained the chimpanzees' clinical records.  *Id.*  The contract between NIH and CRL requires CRL to maintain records associated with the chimpanzees.  *Id.* at 24-25.  The chimpanzees' clinical files are subject to onsite inspection by NIH.  Id. at 24.  NIH concedes that it may "access the chimpanzees' files" at any time.  Defs.' [32] Reply at 8.

Despite the foregoing, NIH asks the Court to reconsider its Order finding that the records located at APF were "agency records."  Defs.' Mot. for Recons. at 8.  According to NIH, these records were not "created or obtained" by NIH, nor were they subject to NIH's "control" at the

time of IDA's FOIA request.  *Id.*  The Court finds that each of these arguments fails for substantially the same reasons they failed in NIH's Motion for Summary Judgment.

NIH's sole argument concerning whether NIH created or obtained the APF records is the following: "Indeed, the clinical files do not belong to the animals, but instead, belong to the animal care provider, Charles River Laboratories."  *Id.*  Needless to say, nothing about this argument indicates that the Court "'patently' misunderstood the parties, made a decision beyond the adversarial issues presented, made an error in failing to consider controlling decisions or data, or [indicates that] a controlling or significant change in the law has occurred."  *Singh,* 383 F. Supp. 2d at 101.  Defendant fails to explain, for example, how the Court erred by requiring NIH to search a facility it owns, for records it requires to be maintained and to which it has access, relating to the care of animals that it owns.  Although the Court acknowledges that NIH's contractor CRL may possess the documents on a day-to-day basis, the D.C. Circuit has made clear that records need not be generated by an agency, or in the actual possession of an agency, for the records to be considered "owned or obtained" by an agency.  *See Burka*, 87 F.3d at 515 (holding that various data tapes were owned or obtained by the agency even though "they were neither created by agency employees, nor . . . currently located on agency property," because the firm that created the tapes "acted on behalf of [the agency] in creating the tapes").  Accordingly, Defendant offers no basis for the Court to reconsider its ruling that the APF documents were "created or obtained" by NIH.

As to the second criteria of the "agency records" inquiry, NIH asserts that the records located at APF were not "controlled" by NIH at the time of IDA's FOIA request.  Def.'s Mot. for Part. Recons. at 9.  In support of this assertion, NIH advances four factual arguments:  (1) NIH

"has not required [CRL] to relinquish control of the clinical chimpanzee files," (2) although NIH

"may access the chimpanzees' files, NIH may not take or dispose of any of the clinical

chimpanzees' files maintained at APF," (3) the records transfer in 2000 "had no affect on the

clinical chimpanzee files created or maintained by [CRL] at the time of the FOIA request from

Plaintiff," and (4) NIH's on-site inspections of APF do not illustrate that it controls the clinical

files.  Def.'s Mot. for Part. Recons. at 9-10.  These arguments do not suggest that the Court's

Order was based on a misunderstanding of any facts or the law, and the latter two arguments in

particular simply suggest that the facts identified by the Court in its Memorandum Opinion (and

those set forth above) are insufficient to support the Court's findings.  The Court disagrees.

IDA asserts (and NIH does not refute) that the contract between NIH and CRL provides

that NIH will retain title to the chimpanzees.  *See* Pls.' Opp'n to Def.'s Mot. for Summ. J. at 9.

NIH also concedes that the clinical files are essential for the continued care of the animals.  *See*

Def.'s Mot. for Part. Recons. at 9 ("the veterinary staff need[s] this information at the facility and

would not relinquish control of the records or let those records leave the facility").  If NIH's

position were accepted, it would follow that CRL would remove the clinical files after its

contract with NIH expires, even though the files pertain to animals it does not own and to which

it cannot take title, while leaving the chimpanzees without the files necessary for their continued

care.  That position is untenable.  NIH's reliance on whether it has literally "relinquished control"

or "disposed" of the records is misplaced because it appears that the records will remain with the

chimpanzees regardless of who is caring for them at a given time – not that the records are owned

by the entity with a day to day possession of the files.  This fact is only underscored by the

transfer of the chimpanzees' records in 2000 when NIH received ownership of the chimpanzees.

*Id.* at 9 (referencing the 2000 document reflecting a transfer of the animals' records by a former contractor to NIH).[1]  Given the facts set forth above, NIH's factual arguments fail to identify any basis for the Court to reconsider the portion of its Order that required NIH to search APF for the requested records.

      B.      *Contractor Answers to NIH Questions for the Revised Contract Proposal*

The Court's Order required NIH to release documents related to answers submitted to NIH by CRL as part of its contract proposal to manage the APF chimpanzee facility.  While NIH had previously claimed these documents were exempt from disclosure based on FOIA Exemption 4, NIH had explicitly dropped this argument in its Opposition to IDA's Cross-Motion for Summary Judgment.  *See* Defs.' Opp'n at 5 (arguing that FOIA Exemption 4 applied only to contractor inventive awards).  The Court therefore concluded that Defendants had conceded the matter.  *See* Mem. Op. dated April 2, 2007 at 29.  NIH's Motion for Reconsideration expressly reasserts Exemption 4 over these documents.

FOIA Exemption 4 applies to "trade secrets and commercial or financial information obtained from a person and privileged or confidential."  5 U.S.C. 552(b)(4); *Gulf & W. Indus. v. United States,* 615 F.2d 527, 529 (D.C. Cir. 1979).  Where, as here, the government requires submission of the information, *see* Defs.' Mot. for Recons. at 11 (stating that the information "was required to be submitted to NIH"), the information is "confidential" if it 1) impairs the government's ability to obtain necessary information in the future, or 2) causes substantial harm to the competitive position of the person from whom the information was obtained.  *See*

---

[1] Even though NIH argues that it cannot literally "dispose" of the files, the Court notes that NIH does not allege that it could not simply copy the files during any of its onsite inspections or at any other time it decides to access the records.

*McDonnell Douglas*, 180 F.3d 303, 305 (D.C. Cir. 1999) (citing *Nat'l Parks & Conservation Ass'n v. Morton*, 498 F.2d 765 (D.C. Cir. 1974)).   The second element requires "both a showing of actual competition and a likelihood of substantial competitive injury."   *Gilda Indus. v. U.S. Customs and Border Protection Bureau*, 457 F. Supp. 2d 6, 9 (D.D.C. 2006) (quoting *Nat'l Parks & Conservation Ass'n,* 498 F.2d at 770).

   NIH's argument for application of this Exemption consists of two sentences.   Reproduced in their entirety, NIH argues:

> Release of [CRL's answers] would cause a substantial competitive harm to [CRL], placing [CRL] at a competitive disadvantage vis-a-vis its competitors in similar future procurements.   Specifically, the disclosure of this cost-related information from [CRL] would allow [CRL's] competitors to access [CRL's] cost and rate information and underbid [CRL] in future procurements.

Defs.' Mot. for Part. Recons. at 11-12.

   These two sentences cannot meet NIH's burden with respect to Exemption 4.   *See* 5 U.S.C. § 552(a)(4)(B) (an agency bears the burden of demonstrating the validity of any exemption that it asserts).   NIH fails to identify with any level of specificity what it means by "cost and rate" information, nor explain how such information could be used by competitors to cause substantial harm to CRL.   NIH's failure in this regard is problematic, as courts in this Circuit routinely reject Exemption 4 arguments that are grounded in generalizations.   *See Ctr. for Public Integrity v. Dep't of Energy*, 191 F. Supp. 2d 187, 194-95 (D.D.C. 2002) ("The Courts of this Circuit have viewed [Exemption 4] arguments with skepticism, generally requiring agencies to disclose information under Exemption 4's competitive harm prong unless they are able to demonstrate that release of the information would be of substantial assistance to competitors in

estimating and undercutting a bidder's future bids."); *Brownstein Zeidman & Schomer v. Dep't of Air Force*, 781 F. Supp. 31, 33 (D.D.C. 1991) (rejecting application of Exemption 4 because the harm that would allegedly result from disclosure of pricing information was "speculative").  *Cf. Gilda Indus.*, 457 F. Supp. 2d at 11 (holding that competitive harm would result where the agency identified 212 competitors and explained how the requested information could be used in combination with publicly available information to "disrupt supply, product lines, supply chains, and customers").  Because the D.C. Circuit has cautioned that "conclusory and generalized allegations of exemptions" are unacceptable, *Found. Church of Scientology of Wash., D.C, Inc. v. Nat'l Sec. Agency*, 610 F.2d 824, 830 (D.C. Cir. 1979) (quoting *Vaughn v. Rosen*, 484 F.2d 820, 826 (1973)), the Court finds no basis to reconsider its Order with respect to these documents.

###### C.     Documents Related to the APF Building

The Court's Order required NIH to disclose "redactions of the square footage of the APF, daily inventories of animals, floor plans and wiring diagrams, specific locations of individual animals, locations of animal records and specimens, numbers of rooms containing equipment, the numbers of animals in specific holding areas, and the square footage of specific areas" (hereinafter "Building information").  *See* Order at 2.  Although NIH's Motion for Summary Judgment only asserted Exemption 6 with respect to these documents, NIH now argues that Exemption 2 is also applicable.  The Court shall consider each exemption in turn.

###### 1.     Exemption 6

Exemption 6 allows agencies to withhold "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy."  5 U.S.C. § 552(b)(6).  This Exemption requires an agency to balance the public's interest in

disclosure with the privacy interest of an individual, and requires the balance of interests to "tilt" in favor of disclosure unless it is "clearly unwarranted." *Wash. Post. Co. v. U.S. Dep't of Health & Human Servs.*, 690 F.2d 252, 261 (D.C. Cir. 1982). This exemption creates a "strong" presumption in favor of disclosure. *Id.*

According to NIH, the Building information would "reveal information related to third-party individuals" because it would show "where the animal care workers are stationed and [would allow] one to determine where the workers would likely be located within the facility." Defs.' Mot. for Part. Recons. at 12. From this premise, NIH concludes that because animal care workers at other facilities have faced threats to their safety, disclosure of these documents would jeopardize the workers' safety at APF. *Id.* at 12-15.

Exemption 6 allows an agency to withhold documents if they contain personal identifying information, such as "place of birth, date of birth, date of marriage, employment history, and comparable data," as well as other personal information the disclosure of which would "constitute a clearly unwarranted invasion of personal privacy." *U.S. Dep't of State, et al. v. Washington Post Co.*, 456 U.S. 595, 600 (1982). The Supreme Court specifically noted that "[i]nformation unrelated to any particular person presumably would not satisfy the threshold test." *Id.* at 602 n.4. Defendants' arguments concerning the safety of animal workers at APF are not properly incorporated into Exemption 6, as the requested information is not associated with any particular individual. This conclusion was explained in the Court's Opinion accompanying its Order, *see* Mem. Op. dated April 2, 2007 at 33-36, and NIH has provided the Court with no basis to reach a different conclusion for purposes of the present Motion.

2.      Exemption 2

NIH suggests, "upon further reflection," that the Building information may be withheld

from disclosure based on Exemption 2.  Defs.' Mot. for Recons. at 16.  Exemption 2 protects

from disclosure materials that are "related solely to the internal personnel rules and practices of

an agency."  5 U.S.C. § 552(b)(2).  Such materials must meet two criteria.  First, the material

must be "used for predominantly internal purposes."  *Crooker v. Bureau of Alcohol, Tobacco and*

*Firearms*, 670 F.2d 1051, 1074 (D.C. Cir. 1981) (en banc).  Second, the agency must show either

that "disclosure [of the material] may risk circumvention of agency regulation" [often called

"High 2"] or that "the material relates to trivial administrative matters of no genuine public

interest [often called "Low 2 "].  NIH argues that the Building information is both High 2 and

Low 2.  *Id.*

NIH's only argument concerning the first of the Exemption 2 criteria is a brief reference

that the information is used for "predominantly internal purposes."  Def.'s Mot. for Part. Recons.

at 16.  NIH does not elaborate on this point.  In *Judicial Watch, Inc. v. United States Dep't of*

*Transp.*, the court found that locations of warehouses where explosive detection systems were

stored was protected under Exemption 2 after a showing that the records revealing these

locations "were created in furtherance of work assigned to FAA contractors and . . . used

internally by FAA."  Civ. A. No. 02-566, 2005 U.S. Dist. LEXIS 14025 at *26-*27 (D.D.C. Jul.

7, 2005).  In contrast, the Building information at issue here is apparently contained in redactions

within larger documents.  *See* Pls.' Opp'n to Defs.' Mot. for Summ. J. at 22 (referring to NIH's

"redactions" in the context of the Exemption 6 information).  NIH provides no factual basis to

suggest that these documents, containing this information, are only used for internal purposes.

13

This reason alone could justify rejection of NIH's Exemption 2 assertion, as "conclusory and generalized allegations of exemptions" are unacceptable. *Found. Church of Scientology of Wash., D.C, Inc.*, 610 F.2d at 830 (quoting *Vaughn*, 484 F.2d at 826).

Even if the first criteria were met, NIH's argument that the Building information is Low 2 information consists of one sentence fragment: "[T]he facility's details, especially with regard to square footage, floor plans and wiring diagrams, specific locations of animals, and designated numbers of rooms containing equipment, are relatively trivial in nature and would serve no public benefit." Defs.' Mot. for Part. Recons. at 18. IDA explains that it has requested this information because it relates to "the living conditions of the chimpanzees at APF" including "the square footage of the chimpanzee cages, the number of chimpanzees housed per cage, the locations of individual animals, and the daily inventory of animals" that IDA deems "crucial given the fact that chimpanzees under Defendants' oversight have suffered from injuries, and even died, due to overcrowding, attacks from other chimpanzees, and poor supervision by staff." Pls.' Opp'n to Defs.' Mot. for Part. Recons. at 14. On this record, the Court cannot find that NIH has met its burden of showing this information is Low 2.

NIH's argument that the Building information is High 2 information is contained in part of one paragraph. According to NIH, the Building information constitutes High 2 information because "it is essentially a blueprint of the APF facility, and its release would significantly risk circumvention of the law . . . . Such disclosure could also lead to criminal incidents, like the fire intentionally started at the nearby Alamogordo Coulston Foundation facility, that would jeopardize the effective operation of government offices." Defs.' Mot. for Part. Recons. at 18.

Information that would allow an individual to circumvent the law is unquestionably one

area that may fall under the protection of Exemption 2.  For example, in *Elliott v. United States Dep't of Agriculture*, the agency withheld blueprints for all buildings within the USDA's Beltsville Agricultural Research Center ("BARC") that the plaintiffs sought in a FOIA request. Civ. A. No. 06-0240, 2007 U.S. Dist. LEXIS 79872 at *1 (D.D.C. Oct. 30, 2007).  The agency explained that the blueprints were used by the Engineering and Construction Branch of the agency's Agricultural Research Service, and the Court noted that there was no dispute that the blueprints were "used for predominantly internal purposes." *Id.* at *3.  The agency then detailed specifically how disclosure of the blueprints "'would render BARC vulnerable to potential threats and unnecessary risk in maintaining physical security over the research programs and critical infrastructure assets at BARC.'" *Id.* at *5 (quoting Defs.' Renewed Mot.).  Specifically,

> [m]iles of state and country roads within BARC's 6,800 acres of land, which is not surrounded by a continuous fence, provide 'literally hundreds of perimeter ingress points that could be utilized by a potential hostile intruder . . . There are research projects at BARC involving 'Select Agents,' biological agents and toxins which must be handled, secured, packages and shipped in accordance with regulations . . . in order to 'protect against [their use] in domestic or international terrorism or for any criminal intent or purpose.

*Id.* at *5-*6.  The agency also explained that there was a "low-level irradiator used in animal research" and "computer network server and router locations through BARC," among several other targets, that would be disclosed and subject to security compromises if the blueprints were released. *Id.* at *9.  On that record, the court found that the agency's decision to withhold the requested blueprints was warranted under FOIA Exemption 2. *Id.* at *10.

In the present case, NIH claims the information requested here is "essentially a blueprint of the APF facility." Defs.' Mot. for Part. Recons. at 18.  NIH's arguments are distinguishable from those in *Elliott* for two reasons.  First, it was clear in *Elliott* that the blueprints were used

only internally, and that they provided information that was so comprehensive that it would lead

to intrusion or other criminal activities associated with the targets located in BARC.  Here, the

information that NIH claims is "essentially a blueprint" appears to be information that has been

redacted from other documents already released, and it is unclear the extent to which this

information may be used to discover the specific locations of the animals, workers, or anything

else in the APF facility – the type of information that may be conveyed in an *actual* blueprint.

NIH makes no argument, for example, that disclosure of floor plans and wiring diagrams

necessarily indicate where security is stationed throughout APF, such that individuals with

criminal intentions may be able to take advantage of the released information.

Second, the agency in *Elliott* was able to connect the blueprints at issue with the possible

criminal activities that could occur.  *See Elliott*, 2007 U.S. Dist. LEXIS 79872 * 6 (explaining

that the blueprints would show, among other things, (1) entries to BARC with minimal security,

thereby allowing an intruder to access sensitive areas; (2) biological agents and toxins that an

intruder could steal; (3) wastewater treatment plans, distributions stations and power transfer

stations that an intruder could target).  Here, NIH does not explain how the requested information

could lead to criminal activities; instead, it references a fire and several other criminal activities

that have occurred at other locations not involving Plaintiffs.  NIH fails to explain, for example,

how the redacted information concerning the "numbers of rooms containing equipment, the

numbers of animals in specific holding areas, and the square footage of specific areas," would

allow individuals to engage in criminal activity.  The Court shall not read this information into

NIH's submissions.[2]  On this record, there is simply no basis for the Court to find that the

information requested constitutes High 2 information.

## IV. CONCLUSION

For the reasons set forth above, the Court shall DENY Defendants' [25] Motion for

Partial Reconsideration.


Date:   December 12, 2007


                              _____/s/_____
                              COLLEEN KOLLAR-KOTELLY
                              United States District Judge

---

[2] This is the second round of briefing NIH has submitted in this respect (not including Reply briefs).  Although NIH did not raise Exemption 2 in its original Motion for Summary Judgment, it attempted to shoehorn the same arguments presented here into Exemption 6.  Now, in its Motion for Reconsideration, NIH makes the same generalized arguments under Exemption 2.  The Court is unwilling to give NIH a third bite at the same apple.  NIH has the burden of showing that an Exemption to disclosure applies, *see* 5 U.S.C. § 552(a)(4)(B), and it has failed repeatedly in that respect.

17