UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

IN DEFENSE OF ANIMALS,

    Plaintiff,

      v.

NATIONAL INSTITUTES OF HEALTH
AND U.S. DEPARTMENT OF HEALTH
AND HUMAN SERVICES,

    Defendants.

Civil Action No. 04-1571 (CKK)

**MEMORANDUM OPINION**
(April 14, 2008)

Presently before the Court is [11] Federal Defendants' Motion for Partial Summary Judgment, [13] Plaintiff's Cross-Motion for Summary Judgment, and [17] Defendants' Second Motion for Partial Summary Judgment.  Plaintiff In Defense of Animals ("IDA"), a non-profit animal advocacy organization, filed this action on September 10, 2004, pursuant to the Freedom of Information Act (FOIA), 5 U.S.C. § 552 (2000 & Supp. II 2002), against Defendants National Institutes of Health (NIH) and the United States Department of Health and Human Services (HHS), requesting that the Court compel Defendants to disclose agency records that were withheld from IDA and to grant IDA a public interest fee waiver for its FOIA request.  On March 16, 2005, Defendants filed a [11] Motion for Partial Summary Judgment, requesting that the Court grant summary judgment in Defendants' favor as to all but 23 pages of requested documents referred to the United States Air Force (USAF) because "NIH conducted a reasonable search, properly invoked and justified its reliance on statutory exemptions [(4), (5), and (6)] under FOIA, and properly denied plaintiff's request for a blanket public interest fee waiver."

Defs.' Mem. for Part. Summ. J. at 10.  Defendants also argue that Plaintiff did not exhaust its

administrative remedies with respect to its document requests.  *Id.* at 10-12.  On March 13, 2005,

Plaintiff filed a [13] Cross Motion for Summary Judgment and Opposition to Defendants'

Motion for Partial Summary Judgment, arguing that Defendants' search for records was

inadequate; that Defendants wrongfully denied Plaintiff's public interest fee waiver request; that

Plaintiff was not required to launch an administrative challenge prior to filing suit; that NIH

improperly asserted FOIA Exemptions 4, 5, and 6, with respect to certain documents; and that

NIH did not properly segregate non-exempt portions of various documents.  Pl.'s Cross Mot. for

Summ. J. at 5-27.[1]  On May 4, 2005, Defendants filed [17] Defendants' Second Motion for

Partial Summary Judgment, arguing that since Defendants had released the 23 responsive pages

initially referred to the USAF to Plaintiff, Defendants should be granted summary judgment with

respect to said pages.  All motions have been fully briefed.  After considering the pending

motions, the filings related thereto, and the relevant statutes and case law, the Court shall

GRANT in part and DENY in part [11] Defendants' Motion for Partial Summary Judgment;

GRANT in part and DENY in part [13] Plaintiff's Cross Motion for Summary Judgment; and

GRANT [17] Defendants' Second Motion for Partial Summary Judgment.  Defendants shall

produce the following information to Plaintiff: 1) incentive payments to the contractor; 2)

answers to NIH questions in the revised contract proposal; 3) the withheld NIH contract

questions; and 4) redactions of the square footage of the APF, daily inventories of animals, floor

---

[1]  While Plaintiff also challenged that "NIH's referral of two documents to other agencies
was not done in a reasonable manner," Pl.'s Cross Mot. for Summ. J. at 25, Plaintiff ultimately
only contests NIH's delayed release of those documents, *see* Pl.'s [18] Reply, which the Court
will address in the context of [17] Defendants' Second Motion for Partial Summary Judgment.

plans and wiring diagrams, specific locations of individual animals, locations of animal records

and specimens, numbers of rooms containing equipment, the numbers of animals in specific

holding areas, and the square footage of specific areas.  Defendants shall also provide Plaintiff

with properly-segregated, redacted versions of Documents 14 and 15 as listed in the *Vaughn*

Index, including the subject matter of the invoices and e-mails at issue.  Defendants shall search

APF for the requested clinical chimpanzee files, using a search cut-off date not earlier than

March 31, 2007, and informing Plaintiff of said cut-off date.  Defendants shall further grant

Plaintiff a public interest fee waiver immediately.

## I. BACKGROUND

After reviewing the Parties' statements of facts and the relevant documents in this case,

the Court has determined that the following facts are not in dispute (and will cite documents

attached to the Complaint when applicable for ease of reference).  By letter dated January 20,

2004, Plaintiff submitted a FOIA request to NIH's component, the National Center for Research

Resources (NCRR), for documents relating to the Alamogordo Primate Facility (APF) and the

chimpanzees maintained therein.  Compl., Ex. 1 (FOIA Request).  APF is a government-owned

and contractor-operated facility in New Mexico.  *Id.*  The chimpanzees located at APF are owned

by the NIH and are being maintained under a contract with Charles River Laboratories, Inc.

(CRL), a publicly held animal research company.  *Id.*

Plaintiff requested the following documents:

[Operational Records]
. . .
1. The NIH's Requests for Proposals ("RFP") and all amendments that led to the award of
the current contract to CRL to operate the APF. . . .
2. The proposals and all amendments submitted by CRL in response to the RFP for the APF

contract.

3. The current APF contract and all amendments between the NIH and CRL, as well as all progress reports, and any other reports, submitted by CRL that are required by the contract. . . .

4. All records relating to the NIH's decision to award the APF contract to CRL.

5. All internal APF records sent or received by any current of former APF employees regarding any aspect of the clinical care, treatment, well-being, husbandry, enrichment and/or psychological well-being, diagnosis, monitoring, observation, cause(s) of death, surveillance and/or adequacy of any of the chimpanzee-specific records described later in this request.

6. All APF records relating to the availability of controlled substances such as euthanasia drugs . . . .

7. All APF records relating to availability of ultrasound machine(s) and any other equipment or resources necessary for the care of chimpanzees . . . .

8. All records related to the APF Institutional Animal Care and Use Committee . . . .

9. All records related to the APF Advisory Board . . . .

10. All records related to any internal investigations conducted by CRL related to any aspect of chimpanzee care, diagnosis, treatment, enrichments, etc., and/or compliance with conditions of the contract between CRL and the NIH to operate the APF.

11. All records related to any internal complaints, concerns, etc. made by any current or former APF employees regarding any aspect of the clinical care, treatment, well-being, observation, monitoring, diagnosis, enrichment and/or psychological well-being, husbandry, cause(s) of death, surveillance and/or adequacy of any of the chimpanzee-specific records described later in this request.

12. All records related to any meetings of current or former APF staff that in any way addressed any aspect of the clinical care, treatment, well-being, observation, monitoring, diagnosis, enrichment and/or psychological well-being, husbandry, cause(s) of death, surveillance and/or adequacy of any of the chimpanzee-specific records described later in this request . . . .

13. All records relating to internal complaints, comments, questions, concerns, etc. regarding the clinical competence, training and/or experience of any veterinarians ever employed by CRL at the APF.

14. All records relating to veterinary turnover at the APF, including but not limited to the resumes/C.V.'s of any and all veterinarians ever employed by CRL at the APF, amount of clinical chimpanzee experience at the time of hire, etc.

[Chimpanzee-Specific Records]
. . .

15. All chimpanzees who have died since CRL took over operation of the APF, including those who have been euthanized.

16. All chimpanzees who have received intensive care and/or emergency care since CRL took over operation of the APF.

17. The 14 chimpanzees whom the Coulston Foundation transferred to the NIH on April 9, 2002 and placed under the care of the APF. . . .

4

*Id.* at 2-5.  Plaintiff accompanied its FOIA request with a request for a news media fee waiver, arguing that because of IDA's "efforts to gather and disseminate news to the public" regarding animal welfare issues, IDA qualified for a waiver of fees as a "news media entity," pursuant to 5 U.S.C. § 552(a)(4)(A)(ii)(II) and 45 C.F.R.§ 5.41.  *Id.* at 5-6.  Additionally, Plaintiff requested a public interest fee waiver on the grounds that, pursuant to 5 U.S.C. § 552(a)(4)(A)(iii) and 45 C.F.R. § 5.45, IDA's request "is not in the commercial interest of IDA or any of its members, and disclosure of the requested information is likely to significantly contribute to public understanding of the operations and activities of the NIH."  *Id.* at 6-10.  In support of Plaintiff's public interest fee waiver request, Plaintiff explained its intended use for the requested documents, how it planned to disseminate the records to the public, and provided examples of how IDA had previously disseminated records obtained under the FOIA to the public.  *Id.*

On March 3, 2004, NIH sent Plaintiff a response letter, acknowledging Plaintiff's FOIA request and denying Plaintiff's request for a public interest fee waiver.  Compl., Ex. 2 (3/3/04 NIH's Denial of IDA's Fee Waiver Request (hereinafter, "NIH's Fee Waiver Denial")) at 1.  NIH stated that IDA "ha[d] not demonstrated that release of the requested information is primarily in the public interest, or that the requested information will be widely distributed."  *Id.*  Additionally, NIH alleged that IDA failed to show "a unique capability to educate the public beyond [IDA's] constituency and similar groups that have the same concerns."  *Id.*  NIH also stated that it would not decide whether IDA qualified for a news media fee waiver because NIH did not anticipate any search fees.  *Id.*  NIH informed IDA of its right to appeal the denial of waiver and how to submit an appeal.  *Id.* at 1-2.

5

Plaintiff administratively appealed NIH's denial of the public interest waiver on March 12, 2004, emphasizing IDA's "ability to interpret information and disseminate it widely as well as to educate the public at large about the NIH's operations and activities in general and at the facility at issue in this request in particular."  Compl., Ex. 3 (3/12/2004 IDA's FOIA Appeal of NIH's Fee Waiver Denial (hereinafter, "IDA's Fee Waiver Appeal")) at 1-2.  NIH responded to IDA's appeal on May 26, 2004, upholding NIH's denial of the public interest fee waiver, and informing IDA of its right to seek judicial review of NIH's final decision.  Compl., Ex. 4 (5/26/04 NIH's Review of IDA's FOIA Appeal (hereinafter, "NIH's Denial of Fee Waiver Appeal")) at 1-2.

By letter dated March 5, 2004, NIH addressed Plaintiff's FOIA request relating to the APF and chimpanzee-specific records.  Compl., Ex. 5 (3/5/04 NIH's Response to IDA's FOIA Request (hereinafter, "March 5, 2004 Response")).  NIH agreed to send IDA "all material consistent with the exemptions recognized by the FOIA," and explained that its disclosures would follow HHS's policy of "expung[ing] confidential commercial or financial information, evaluative material, EIN numbers, and personal information such as social security numbers, individual salaries and names of and identifying information about staff who are not listed as key personnel on the contract."  *Id.* at 1.  NIH also informed IDA that if IDA objected to the redaction of this information, IDA could write to NCRR's Freedom of Information Coordinator, who would consult with the NIH Freedom of Information Officer.  *Id*.

On July 23, 2004, NIH partially responded to Plaintiff's FOIA request by releasing 187 pages of documents, including the contract awarded to CRL to operate the APF, portions of the technical proposal that were incorporated into the contract, and modifications to the contract.

Compl., Ex. 6 (7/23/04 Partial Response to IDA's FOIA Request (hereinafter, "July 23, 2004

Response")) at 1.  NIH informed Plaintiff that this disclosure followed the HHS policy of

redacting "cost and fixed fees; estimated costs; fringe benefits; labor/overhead rates; line item

costs; negotiated costs; EIN number; names of non-key personnel; number of personnel; resumes

other than that of the principal investigator; names and information on subcontractors and

consultants; and floor plans."  *Id.*  NIH added that, as part of NIH policy, it also withheld "the

building number of structures that house animals."  *Id.*  NIH also informed IDA that if IDA

objected to NIH's omissions, IDA could write to NCRR's Freedom of Information Coordinator,

who would then consult with NIH's Freedom of Information Officer.  *Id.*  Finally, NIH stated

that it would continue to process the remaining documents that IDA had requested.  *Id.*

     Plaintiff filed its Complaint with this Court on September 10, 2004, seeking the

completion of the processing of its FOIA request, a full release of documents, and an order

granting IDA its requested public interest fee waiver.[2]  Compl. at 6.  On November 5, 2004, NIH

sent Plaintiff a letter stating that in NIH's July disclosure, it released 187 pages instead of 188

documents, and that certain information was redacted in error.  Defs.' Mot. for Part. Summ. J.,

Ex. A (11/5/04 NIH's Letter Regarding Erroneous Redactions (hereinafter, "November 5, 2004

Response")) at 1.  NIH enclosed copies of the re-released and properly redacted documents.  *Id.*

at 1-2.  NIH also informed Plaintiff that NIH would continue to process the other documents that

IDA had requested.  *Id.* at 2.

---

[2]  On October 13, 2004, Defendants filed a Motion for Extension of Time to respond to
the Complaint, which the Court granted until November 16, 2004.  Defendants requested another
extension, which was granted until January 18, 2005.  Defendants filed an Answer to Plaintiff's
Complaint on January 18, 2005.

On November 29, 2004, NIH released an additional 123 pages of records to Plaintiff,

including the solicitation letters sent to CRL, the Justification for Other than Full and Open

Competition, certain site visit reports, and various records related to the composition of the

Institutional Animal Care and Use Committee.  Defs.' Mot. for Part. Summ. J., Ex. A (11/29/04

Partial Response to IDA's FOIA Request (hereinafter, "November 29, 2004 Response")) at 2.

NIH informed IDA that, in accordance with HHS and NIH FOIA policy, certain information had

been redacted from the released documents, including names of Institutional Animal Care and

Use Committee members other than the Chairperson and the Institutional Veterinarian, names of

unsuccessful offerors, estimated costs and labor rates, home addresses, telephone numbers, e-

mail addresses, and names of non-key personnel.  *Id.*  NIH also stated that if IDA wanted to

challenge the redaction of information, IDA could write to NCRR's FOI coordinator, who would

consult with NIH's FOI officer.  *Id.*  NIH also stated that it would continue to process the other

documents in response to IDA's request and would make further releases.  *Id.*

On January 11, 2005, NIH released 710 pages of documents to Plaintiff, including APF

Annual Reports, project schedules and monthly progress reports, source selection determinations,

and miscellaneous records and correspondence.  Defs.' Mot. for Part. Summ. J., Ex. A (1/11/05

Final Response to IDA's FOIA Request (hereinafter, "January 11, 2005 Response")) at 2-3.  NIH

informed Plaintiff that NIH had redacted certain information from these documents, including

evaluations and opinions of NIH employees relating to the contractor, names, contact information

and biographical information of subcontractors, vendors, and CRL non-key personnel, and room

numbers and locations of animals.  *Id.*  Additionally, NIH stated that it had withheld 60 pages of

records in their entirety that were responsive to IDA's request, and informed IDA that the search

of NCRR files did not produce any records that were responsive to Plaintiff's Requested Items A5, A6, A11, A12, B3 and B4. *Id.* NIH indicated that its January 11, 2005 letter and document disclosure constituted NIH's final response to IDA's FOIA request, and that IDA had a right to appeal NIH's decision to deny records and NIH's finding that no records exist that are responsive to Plaintiff's Requested Items A5, A6, A11, A12, B3 and B4. *Id.*

NIH's January 11, 2005 Response also informed IDA that NIH had referred two pages of records that originated with the United States Department of Agriculture (USDA) and 23 pages that originated with the USAF "to the respective agencies for their review and determination of releasability." *Id.* at 2. NIH had referred these documents to the respective agencies on August 3, 2004 and November 24, 2004. Defs.' Statement of Material Facts Not in Genuine Issue 3/16/05 (hereinafter, "Defs.' Statement of Facts 3/16/05") ¶ 11. By letter dated March 15, 2005, the USDA released to Plaintiff the two referred pages. *Id.* ¶ 12. On April 14, 2005, the USAF approved the release of some of the referred documents, but Defendants allege that they were unable to coordinate with the USAF the documents' final release. Defs.' Statement of Material Facts Not in Genuine Issue 5/4/05 (hereinafter, "Defs.' Statement of Facts 5/4/05") ¶¶ 4, 5. On May 4, 2005, Defendants released the 23 pages to IDA. *Id.* ¶ 5.

On March 16, 2005, Defendants filed a Motion for Partial Summary Judgment on the following grounds: (1) Plaintiff failed to exhaust administrative remedies by failing to administratively challenge any aspect of its FOIA request and appealing only NIH's denial of a public interest fee waiver; (2) Defendants conducted an adequate search in response to Plaintiff's FOIA request; (3) Defendants properly applied FOIA Exemptions 4, 5, and 6, properly withholding certain information as set forth in an attached *Vaughn* index; (4) Defendants' referral

9

of documents to USDA and USAF was reasonable; (5) no reasonably segregable, non-exempt portions of any document have been withheld; and (6) Defendants properly denied Plaintiff's request for a public interest fee waiver.  Defs.' Mem. for Part. Summ. J. at 10-33.

On April 13, 2005, Plaintiff filed an Opposition to Defendants' Motion for Partial Summary Judgment as well as a Cross-Motion for Summary Judgment, in which Plaintiff argued that (1) Defendants' search for records was inadequate; (2) Defendants wrongfully denied Plaintiff's public interest fee waiver request; (3) Plaintiff was not required to launch an administrative challenge prior to filing suit; (4) NIH improperly asserted FOIA Exemptions 4, 5, and 6, with respect to certain documents; and (5) NIH did not properly segregate non-exempt portions of various documents.  Pl.'s Cross Mot. for Summ. J. at 5-27.  On May 4, 2005, Defendants filed [17] Defendants' Second Motion for Partial Summary Judgment, arguing that since Defendants had released the 23 responsive pages initially referred to the USAF to Plaintiff, Defendants should be granted summary judgment with respect to said pages.  All motions have been fully briefed.

## II. LEGAL STANDARD

In reviewing a motion for summary judgment under the FOIA, the Court must conduct a *de novo* review of the record.  *See* 5 U.S.C. § 552(a)(4)(B).  "In the FOIA context, *de novo* review requires the court to 'ascertain whether the agency has sustained its burden of demonstrating that the documents requested are not "agency records" or are exempt from disclosure under the FOIA.'"  *Assassination Archives & Research Ctr. v. Cent. Intelligence Agency*, 334 F.3d 55, 57 (D.C. Cir. 2003) (quoting *Summers v. Dep't of Justice*, 140 F.3d 1077, 1080 (D.C. Cir. 1998)).

Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  A genuine issue of material fact exists only when there is sufficient evidence such that a reasonable juror could find for the party opposing the motion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). Furthermore, entry of summary judgment is mandated against a party if, after "adequate time for discovery and upon motion, [the party] fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).

FOIA cases are typically and appropriately decided on motions for summary judgment. *Miscavige v. Internal Revenue Serv.*, 2 F.3d 366, 369 (11th Cir. 1993); *Rushford v. Civiletti*, 485 F. Supp. 477, 481 n.13 (D.D.C. 1980).  Under FOIA, all underlying facts and inferences are analyzed in the light most favorable to the FOIA requester; as such, only after an agency seeking it proves that it has fully "discharged its [FOIA] obligations" is summary judgment appropriate. *Moore v. Aspin*, 916 F. Supp. 32, 35 (D.D.C. 1996) (citing *Weisberg v. Dep't of Justice*, 705 F.2d 1344, 1350 (D.C. Cir. 1983)).  "The agency bears the burden of showing that its search was adequate" and in good faith.  *Tarullo v. Dep't of Defense*, 170 F. Supp. 2d 271, 274 (D. Conn. 2001).  At a minimum, a good faith search effort uses methods that can be reasonably expected to produce the information requested.  *See Ogelsby v. Dep't of Army*, 920 F.2d 57, 68 (D.C. Cir. 1990) ("[T]he agency cannot limit its search to only one record system if there are others that are

11

likely to turn up the information requested.").

Congress enacted FOIA for the purpose of introducing transparency to government activities. *See Stern v. Fed. Bureau of Investigation*, 737 F.2d 84, 88 (D.C. Cir. 1984). Congress remained sensitive, however, to the need to achieve balance between this objective and the vulnerability of "legitimate governmental and private interests [that] could be harmed by release of certain types of information." *Critical Mass Energy Project v. Nuclear Regulatory Comm'n*, 975 F.2d 871, 872 (D.C. Cir. 1992). Accordingly, FOIA provides nine exemptions pursuant to which an agency may withhold requested information. 5 U.S.C. §§ 552(a)(4)(B), (b)(1)-(9). *See Summers v. Dep't of Justice*, 140 F.3d 1077, 1080 (D.C. Cir. 1998) (recognizing that "release of certain information may harm legitimate governmental or private interests" and noting exemptions allowing agencies to withhold requested documents). The agency must demonstrate the validity of any exemption that it asserts. 5 U.S.C. § 552(a)(2); *Beck v. Dep't of Justice*, 997 F.2d 1489, 1491 (D.C. Cir. 1993) ("Consistent with the purpose of the Act, the burden is on the agency to justify withholding requested documents."). To satisfy this burden, the agency may provide a plaintiff "with a *Vaughn* index, which must adequately describe each withheld document, state which exemption the agency claims for each withheld document, and explain the exemption's relevance." *Johnson v. Exec. Office for U.S. Att'ys*, 310 F.3d 771, 774 (D.C. Cir. 2002); *see also Vaughn v. Rosen*, 484 F.2d 820, 827 (D.C. Cir. 1973) (requiring that this index be "adequate[ly] specific[] to assur[e] a proper justification by the governmental agency"). In addition, summary judgment may be granted on the basis of the agency's accompanying affidavits or declarations if they describe "the justifications for nondisclosure with reasonably specific detail, demonstrate that the information withheld logically falls within the claimed

exemption, and are not controverted by either contrary evidence in the record nor by evidence of agency bad faith." *Military Audit Project v. Casey*, 656 F.2d 724, 738 (D.C. Cir. 1981). These affidavits may be submitted by an official who coordinated the search, and need not be from each individual who participated in the search. *See SafeCard Servs. v. Sec. & Exch. Comm'n*, 926 F.2d 1197, 1200 (D.C. Cir. 1991) ("[The person] in charge of coordinating the SEC's search and recovery efforts . . . is the most appropriate person to provide a comprehensive affidavit.")..

There is no set formula for a *Vaughn* index; so long as the agency provides the Court with materials providing a "reasonable basis to evaluate the claim of privilege," the precise form of the agency's submission – whether it be an index, a detailed declaration, or a narrative – is immaterial. *Gallant v. Nat'l Labor Relations Bd.*, 26 F.3d 168, 173 (D.C. Cir. 1994) (internal citations omitted). While *Vaughn* indices are generally discretionary, affidavits alone may not suffice once it is established that records and documents are in a governmental agency's possession. *Miscavige*, 2 F.3d at 368 (citing *Stephenson v. Internal Revenue Serv.*, 629 F.2d 1140, 1145 (5th Cir. 1980)). Therefore, it is in a governmental agency's best interest to provide a *Vaughn* index when claiming privilege, should it seek to satisfy its disclosure burden.

Courts must "accord substantial weight" to an agency's affidavit regarding FOIA exemptions. 5 U.S.C. § 552(a)(4)(B); *see also Carney v. Dep't of Justice*, 19 F.3d 807, 812 (2d Cir. 1994), *cert. denied*, 513 U.S. 823, 115 S. Ct. 86, 130 L. Ed. 2d 38 (1994) ("Affidavits submitted by an agency are 'accorded a presumption of good faith.'") (quoting *SafeCard Servs., Inc.*, 926 F.2d at 1200). Indeed, since FOIA exemptions are narrowly construed, should an agency correctly show that the FOIA does not apply to withheld material, the Court's review of the agency's decision is limited to determining whether the agency abused its discretion. *Mead*

*Data Cent., Inc. v. Dep't of Air Force*, 566 F.2d 242, 259 (D.C. Cir. 1977).  Therefore, should an exemption correctly apply, an agency's justification for withholding information need not allude to a specific injury.  *See id.* at 258-59 (permitting the agency to rely upon the explanation that disclosure "would impair the deliberative process . . . by impairing the free and frank exchange of ideas among [agency] personnel").

Moreover, the agency must detail "what proportion of the information in a document is non-exempt and how that material is dispersed throughout the document." *Id.* at 261.  Any non-exempt information that is reasonably segregable from the requested records must be disclosed. *Ogelsby v. Dep't of Army*, 79 F.3d 1172, 1178 (D.C. Cir. 1996).  In addition, district courts are required to address segregability issues *sua sponte* even when the parties have not specifically raised such claims. *Trans-Pac. Policing Agreement v. U.S. Customs Serv.*, 177 F.3d 1022, 1028 (D.C. Cir. 1999).

In opposing a motion for summary judgment, a plaintiff must offer more than conclusory statements. *See Broaddrick v. Exec. Office of President*, 139 F. Supp. 2d 55, 65 (D.D.C. 2001) (citing *Laningham v. U. S. Navy*, 813 F.2d 1236, 1241 (D.C. Cir. 1987)).

> Indeed, a plaintiff [pursuing an action under FOIA] must establish that either:  (1) the *Vaughn* index does not establish that the documents were properly withheld; (2) the agency has improperly claimed an exemption as a matter of law; or (3) the agency has failed to segregate and disclose all non-exempt material in the requested documents.

*Perry-Torres v. Dep't of State*, 404 F. Supp. 2d 140, 142 (D.D.C. 2005); *Twist v. Ashcroft*, 329 F. Supp. 2d 50, 53 (D.D.C. 2004) (citing *Piper & Marbury, LLP v. U.S. Postal Serv.*, Civ. No. 99-2383, 2001 WL 214217, at *2 (D.D.C. Mar. 6, 2001)).

### III. DISCUSSION

14

The Freedom of Information Act requires federal agencies, in responding to a request for information, to: (1) conduct an adequate search for that information through reasonable efforts; (2) provide the information to the requester, unless it falls within a FOIA exemption; and (3) provide to a requester any information that can reasonably be segregated from the exempt information.  5 U.S.C. § 552(a)(3); 5 U.S.C. § 552(b).  In response to Plaintiff's FOIA request, Defendants have withheld portions of documents under Exemptions 4, 5, and 6 of the FOIA, 5 U.S.C. §§ 522(b)(4), (b)(5), and (b)(6).  Plaintiff only challenges Defendants' withholding of portions of specific documents under Exemptions 4, 5, and 6.  Plaintiff further argues that Defendants have failed to conduct an adequate search, that Defendants have not released all reasonably segregable factual material, and that Defendants improperly denied Plaintiff's request for a public interest fee waiver.  As a result, Plaintiff asserts that this Court should:

1) Order NIH to search for and produce requested records that are located at the APF.

2) Vacate the public interest fee waiver denial and order NIH to waive fees for this request.

3) Order the release of improperly redacted or withheld information under Exemption 4: the incentive amounts arranged for the contractor in the contract; order the release or further explanation for withholding the contractor's answers to NIH questions that were incorporated into the request for proposal during the bid process.

4) Order the release of improperly redacted or withheld information under Exemption 5: the incentive amounts arranged for the contractor in the contract and NIH's questions to the contractor that were incorporated in the request for proposal during the bid process.

5) Order the release of improperly redacted or withheld information under Exemption 6: the square footage of the APF, daily inventories of animals, floor plans and wiring diagrams, specific locations of individual animals, locations of records and specimens, numbers of rooms containing equipment, the numbers of animals in specific holding areas, and the square footage of specific areas.
. . .

15

7) Order NIH to produce the segregable, underlying factual information that was withheld when it completely withheld invoices for subcontractors, vendors, and equipment.

Pl.'s Mot. for Summ. J. at 27-28.

The Court will address each issue raised by the Parties in turn.

A.    *Defendants' Actions Did Not Trigger an Exhaustion Requirement*

In a FOIA case, exhaustion of administrative remedies is generally required before a party can seek judicial review of a FOIA-related withholding.  *See, e.g.*, *Spannaus v. U.S. Dep't of Justice*, 824 F.2d 52, 58 (D.C. Cir. 1987); *Dettmann v. U.S. Dep't of Justice*, 802 F.2d 1472, 1477 (D.C. Cir. 1986); *Stebbins v. Nationwide Mut. Ins. Co.*, 757 F.2d 364, 366 (D.C. Cir. 1985); *see also Pollack v. U.S. Dep't of Justice*, 49 F.3d 115, 118 (4th Cir. 1995) (holding that a plaintiff "may generally seek judicial review of his FOIA request only after he has exhausted all administrative remedies").  The exhaustion requirement is not jurisdictional because FOIA does not unequivocally make it so.  *Hidalgo v. FBI*, 344 F.3d 1256, 1258 (D.C. Cir. 2003).  However, "as a jurisprudential doctrine, failure to exhaust [administrative remedies] precludes judicial review if 'the purposes of exhaustion' and the 'particular administrative scheme' support such a bar."  *Id.* at 1258-59 (citing *Oglesby*, 920 F.2d at 61); *Taylor v. Appleton*, 30 F.3d 1365, 1367-68 & n.3 (11th Cir. 1994) (concluding that exhaustion, although not jurisdictional, is a "condition precedent" to filing suit).  This Circuit has held that "FOIA's administrative scheme favors treating failure to exhaust as a bar to judicial review" and that allowing parties to pursue judicial review under FOIA without exhausting administrative remedies would undercut the purposes of exhaustion.  *Hidalgo*, 344 F.3d at 1259.

"The statutory scheme in the FOIA specifically provides for an administrative appeal

process following an agency's denial of a FOIA request." *Oglesby*, 920 F.2d at 61.  After

receiving a FOIA request, an agency is required to:

> (i) determine within 20 days (excepting Saturdays, Sundays, and legal public holidays)
> after the receipt of any such request whether to comply with such request and shall
> immediately notify the person making such request of such determination and the reasons
> therefor, *and of the right of such person to appeal to the head of the agency any adverse
> determination*; and

> (ii) make a determination with respect to any appeal within twenty days
> (excepting Saturdays, Sundays, and legal public holidays) after the receipt of such
> appeal.  If on appeal the denial of the request for records is in whole or in part
> upheld, the agency shall notify the person making such request of the provisions
> for judicial review of that determination under paragraph (4) of this subsection.

5 U.S.C. § 552(a)(6)(A) (emphasis added).  If the agency fails to comply with the time limit

provisions of Section 552(a)(6)(A)(i), the requesting party "shall be deemed to have exhausted

his administrative remedies with respect to such request," 5 U.S.C. § 552(a)(6)(C), and may file a

lawsuit regarding the FOIA request.  *Spannaus*, 824 F.2d at 58 (holding that the time period for

"constructive exhaustion" set out in Section 552(a)(6)(A)(i) allows the requesting party to file

suit to compel agency's response to a FOIA request).  However, the D.C. Circuit has held that if

an agency responds to the request after the deadline, but before the requester has filed suit, the

requesting party must exhaust administrative remedies before seeking judicial review.  *Oglesby*,

920 F.2d at 64.  Therefore, the exhaustion doctrine applies where the agency "cures its failure to

respond within the statutory period by responding to the FOIA request before suit is filed." *Id.* at

63.  Furthermore, a court may find that a FOIA requester failed to exhaust administrative

remedies if the agency can show that the requester failed to follow certain administrative

procedures.  For example, exhaustion of remedies does not occur until required fees are paid or

an appeal is taken from the denial of a request for a fee waiver.  *Oglesby*, 920 F.2d at 66 (citing

*Nat'l Treasury Employees Union v. Griffin*, 811 F.2d 644, 648 (D.C. Cir. 1987)).

In the instant case, however, Defendants' actions did not trigger the exhaustion requirement as set forth above.  Pursuant to 5 U.S.C. § 552(a)(6)(A), an agency faced with a request for records shall "determine within 20 days . . . after the receipt of any such request whether to comply with such request and shall immediately notify the person making such request *of such determination* and the reasons therefor, *and of the right of such person to appeal to the head of the agency any adverse determination*."  *Id.* (emphasis added).  First of all, Defendants did not explicitly notify Plaintiff of "[its] right . . . to appeal to the head of the agency any adverse determination," until January 11, 2005–after Plaintiff had filed suit on September 10, 2004.  *See* Defs.' Mot. for Part. Summ. J., Ex. A (January 11, 2005 Response) at 3 ("Although the information at issue is the subject of a lawsuit filed by IDA against NIH, I am nonetheless required to advise you that you have a right to appeal this decision to deny you access to records in the agency's possession and that no records exist that would be responsive to part of your request.").  Defendants' letters to Plaintiff dated *prior* to Plaintiff's filing suit–namely, Defendants' March 5, 2004 letter and July 23, 2004 letter–did not include therein any language respecting Plaintiff's right to appeal to the head of the agency.  *See* Compl., Exs. 5 (March 5, 2004 Response), 6 (July 23, 2004 Response).  Language in both letters to the effect of "[i]f you feel that any material has been omitted that should have been made available to you, please write to me [Joyce McDonald, Freedom of Information Coordinator, NCRR] and I will consult with the NIH Freedom of Information Officer" does not meet the notice requirement as set forth in 5 U.S.C. § 552(a)(6)(A)(i).  Compl., Ex. 6 (July 23, 2004 Response).  Defendants did not indicate their decision to comply or not comply with Plaintiff's entire request until after Plaintiff filed suit

18

on September 10, 2004.  *See* Defs.' Mot. for Part. Summ. J., Ex. A (January 11, 2005 Response)

("This is a final response to your January 20, 2004, [FOIA] request . . . .").  Finally, Plaintiff's

nonpayment of fees does not preclude judicial review because Plaintiff timely appealed

Defendants' denial of its request for fee waiver.  *See Oglesby*, 920 F.2d at 66 (citing *Nat'l*

*Treasury Employees Union*, 811 F.2d at 648).  The Court further notes Plaintiff's statement,

which is not refuted by Defendants, that it was not invoiced until well-after Plaintiff filed suit.

*See* Pls.' Cross Mot. for Summ. J. at 15 ("NIH did not send IDA a fee invoice for the records

until January 11, 2005, which was four months after IDA had initiated this action and one year

after IDA submitted its FOIA request.").

> The United States Court of Appeals for the District of Columbia has held that
>
> [a] response is sufficient for purposes of requiring an administrative appeal if it includes: the agency's determination of whether or not to comply with the request; the reasons for its decision; and notice of the right of the requester to appeal to the head of the agency if the initial agency decision is adverse.  Assuming an agency's initial response complies with these requirements, the FOIA requester must appeal to the head of the agency.

Oglesby, 920 F.2d at 65 (internal citations omitted).  Defendants' responses prior to Plaintiff's

filing suit neither constituted an actual agency decision with respect to the entire request, nor did

they notify Plaintiff of its right to appeal.  Accordingly, no administrative appeal was required.

> B.    *Defendants Have Not Met the Standard for Summary Judgment By Conducting An Adequate Document Search*

In determining the adequacy of a FOIA search, the Court is guided by principles of

reasonableness.  *Ogelsby*, 920 F.2d at 68.  To obtain summary judgment on the issue of the

adequacy of the records search, "the agency must show, viewing the facts in the light most

favorable to the requester, that . . . '[it] has conducted a "search reasonably calculated to uncover

relevant documents."'" *Steinberg v. Dep't. of Justice*, 23 F.3d 548, 551 (D.C. Cir. 1994)

(quoting *Weisberg v. Dep't of Justice*, 745 F.2d 1476, 1485 (D.C. Cir. 1984)).  To meet its

burden, the agency may submit affidavits or declarations that explain both in reasonable detail

and in a non-conclusory fashion the scope and method of the agency's search.  *Perry v. Block*,

684 F.2d 121, 126 (D.C. Cir. 1982).  In the absence of contrary evidence, such affidavits or

declarations are sufficient to demonstrate an agency's compliance with the FOIA.  *Id.* at 127.  An

agency must demonstrate that it made a "good faith effort to conduct a search for the requested

records, using methods which can be reasonably expected to produce the information requested."

*Ogelsby*, 920 F.2d at 68.  *See Campbell v. U.S. Dep't of Justice*, 164 F.3d 20, 27 (D.C. Cir.

1998).  An agency's search need not be exhaustive, merely reasonable.  *See W. Ctr. for

Journalism v. Internal Revenue Serv.*, 116 F. Supp. 2d 1, 8 (D.D.C. 2000) (citing *Shaw v. Dep't

of State*, 559 F. Supp. 1053, 1057 (D.D.C. 1983)).

Plaintiff makes two specific arguments with respect to the adequacy of Defendants'

search, which the Court shall address in turn.

1.    Defendants did not demonstrate that February 5, 2004 was a reasonable
cut-off date for Defendants' search

Accordingly to the Declaration of Susan R. Cornell, the Freedom of Information Officer

at NIH since May 13, 1999, "[t]he NCRR FOI Coordinator began the search for the responsive

records on February 5, 2004.  Current HHS and Department of Justice guidance is that the cut-off

dates for searches are the day the search begins.  Because NCRR began the search for the

responsive records on February 5, 2004, that date provided a time scope for the search."  Defs.'

Mot. for Part. Summ. J., Ex. A ¶ 5 (Declaration of Susan R. Cornell, March 16, 2005

(hereinafter, "Cornell Declaration").  Plaintiff argues that "NIH's time-of-search cut-off date" of February 5, 2004, "is not reasonable."  Pl.'s Cross Mot. for Summ. J. at 24.  "Therefore, as a form of remedy, NIH's supplemental search for records located at the APF [discussed below] and for the periodic reports should not be date-limited to February 5, 2004."  *Id.* at 25.

"[W]e hold that the agency bears the burden of establishing that any limitations on the search it undertakes in a particular case comport with its obligation to conduct a reasonably thorough investigation.  It seems to us clear that the burden of persuasion on this matter is properly imposed on the agency."  *McGehee v. C.I.A.*, 697 F.2d 1095, 1101 (D.C. Cir. 1983). While the D.C. Circuit "concluded that neither the terms of the statute nor the case law interpreting them supports a claim that the use of a time-of-request cut-off date is *always* proper," it instructs "turn[ing] to the particular facts of the case . . . to assess the reasonableness of the agency's conduct.  *Id.* at 1101.  *See also Public Citizen v. Dep't of State,* 276 F.3d 634, 643 (D.C. Cir. 2002) ("*McGehee* expressly rejected the proposition that under FOIA, the 'use of a time-of-request cut-off date is always reasonable.'  *McGehee,* 697 F.2d at 1102.  Although specific circumstances in some agencies may render an across-the-board rule reasonable, the Department has made no showing that warrants such an approach in its case.").  In *McGehee*, the court concluded that a delay of over two and a half years required further investigation by the district court before the reasonableness of a time-of-request cut-off date for a search could be upheld.  While the eleven-month lag between the start of the search and Defendants' final production of documents to Plaintiff in this case does not strike the Court as presumptively unreasonable, Defendants make no attempt to sustain their burden of demonstrating the reasonableness of this cut-off date other than relying on unspecified agency policy.  Defendants

never contest in their Opposition to Plaintiff's Cross Motion for Summary Judgment Plaintiff's

allegations of unreasonableness.  While the court in *Public Citizen* held that "nothing in this

opinion precludes either the Department or any other federal agency from attempting a more

compelling justification for imposing a date-of-request cut-off on a particular FOIA request,"

*Public Citizen*, 276 F.3d at 644, Defendants have advanced no justification of any kind in this

case.

The Court also notes that the D.C. Circuit held that the use of any cut-off date should be

relayed to the requestor: "Unless on remand some extraordinary showing is forthcoming of why

the agency should not be required to inform requesters of the dates it is using, the CIA's

*unpublicized* temporal limitation of its searches should be held invalid."  *McGehee*, 697 F.2d at

1105.  Plaintiff indicates, and Defendants do not refute, that "NIH did not inform IDA that the

cut-off date for the search was February 5, 2004."  Pls.' Cross Mot. for Summ. J. at 24.

Accordingly, as Defendants have not met their burden in demonstrating the reasonableness of a

February 5, 2004 search cut-off date, the Court shall require NIH's supplemental search for

records located at the APF to incorporate a cut-off date not earlier than the date of the Order

accompanying this Memorandum Opinion, and that Defendants shall inform Plaintiff of said cut-

off date.

      2.     <u>Requested Clinical Chimpanzee files are NIH files within Defendants'</u>
<u>control and must be searched</u>

The heart of Plaintiff's adequacy of search argument is that Defendants have

unreasonably failed to search for requested records located at the APF.  According to Ms.

Cornell's Declaration:

NIH's search of NCRR files did not produce any responsive records on the medical files of the 14 chimpanzees named in the IDA's FOIA request because NCRR does not maintain copies of the medical records of the chimpanzees. Under the HHS FOIA regulations, 45 CFR § 5.24, NIH [as a division of HHS] is required to furnish copies of records only when they are in NIH's possession or NIH can retrieve them from storage. The APF, located on Holloman Air Force Base in Alamogordo, New Mexico, is operated by CRL under a contract with NIH. The APF is a "government-owned, contractor-operated" chimpanzee holding facility. CRL is responsible for the facility's day-to-day operations. No medical records of the chimpanzees are kept at, or under control of NIH because NCRR does not need the records to perform its oversight of the APF contract with CRL. Rather, the medical records are maintained at APF, where the animals are cared for and housed. CRL needs daily access to the records in order to monitor the health of the animals and record any changes. When instances occur where NCRR needs more details on the animals' health or maintenance, the contractor provides the information, typically through the monthly reports or as part of records submitted by the APF Institutional Animal Care and Use Committee. NCRR provided these monthly and IACUC reports in its possession to IDA in NIH's responses dated November 29, 2004, and January 11, 2005.

Cornell Decl. ¶ 13.

The Court concludes that the chimpanzee clinical records requested by Plaintiff located at APF clearly meet the criteria defining "agency records" set forth in *United States Department of Justice v. Tax Analysts*: "First, an agency must 'either create or obtain' the requested materials 'as a prerequisite to its becoming an "agency record" within the meaning of the FOIA.' . . . To restrict the term 'agency records' to materials generated internally would frustrate Congress' desire to put within public reach the information available to an agency in its decision-making processes. . . . Second, the agency must be in control of the requested materials at the time the FOIA request is made." *U.S. Dep't. of Justice v. Tax Analysts*, 492 U.S. 136, 144-145, 109 S. Ct. 2841, 2848, 106 L. Ed. 2d 112 (1989). A four-factor test is used in this Circuit to evaluate whether an agency "controls" a record:

1) the intent of the document's creator to retain or relinquish control over the records; (2) the ability of the agency to use and dispose of the record as it sees fit; (3) the extent to

which agency personnel have read or relied upon the document; and (4) the degree to
which the document was integrated into the agency's record system or files.

*Burka v. U.S. Dep't of Health and Human Services*, 87 F.3d 508, 515 (D.C. Cir. 1996) (quoting

*Tax Analysts v. Dep't of Justice*, 845 F.2d 1060, 1069 (D.C. Cir. 1988)).

In this case, it is undisputed that Defendants own the facility in question where the

documents are kept such that the records held there have been "obtained." *See* Defs' Mem. for

Part. Summ. J. at 16. Furthermore, Defendants own the chimpanzees kept at APF. *See* Pl.'s

Cross Mot. for Summ. J., Ex. 1 at 4 (Contract) ("the National Center for Research Resources

(NCRR) of the National Institutes of Health (NIH) has assumed ownership of approximately 257

chimpanzees at the APF . . . . The Contractor shall operate and maintain the associated long-

term care facility, as well as provide overall facility operation and maintenance.") However, the

most important factor for the Court to consider is that Defendants have ownership over the

chimpanzees' clinical files. "According to the transfer document signed in May 2000, each

animal's records transferred with the animal from [The Coulston Foundation] to NCRR." *See*

Pl.'s Reply, Ex. A at 6 (Streamlined Statement of Work for the Operation and Maintenance of

the Alamagordo Primate Facility (APF)). Furthermore, NIH personnel can access the

chimpanzee medical records at APF. *See* Pl.'s Cross Mot. for Summ. J., Ex. 1 at 8 (Contract)

("there may be on-site inspections to ascertain whether there are deficiencies in animal care, to

assess the condition of the facility and as otherwise required for full performance of this work.").

Finally, NIH received at least one report including a commitment that clinical files were being

created and maintained on-site. *See id.* at 30-31 (March 2002 Project Schedule ("*Maintaining*

*Chimpanzee Permanent Records*: Permanent hardcopy records are kept in the office of the

Information Technologist . . . in Building 1303.  A permanent record is kept on each chimpanzee housed at the facility.  The records are the collection of data generated for or by each animal . . . .").

Accordingly, the Court holds that NIH must search for the requested clinical records at APF, as such records are in fact agency records within the meaning of FOIA because they have been obtained by virtue of their location within an NIH facility and are within NIH's control. However, while Plaintiff cursorily states in its Motion that "[i]n addition to clinical records, because NIH did not search for any requested records at NIH's APF, NIH should be ordered to search for and produce requested records from IDA's other subject categories that are likely located at the APF," Pls.' Cross Motion for Summ. J. at 11, the Court shall not address this broader request on the basis of a single sentence devoid of any argument in Plaintiff's brief.

As the Court turns to address Plaintiff's arguments with respect to Defendants' application of FOIA Exemptions 4, 5, and 6 as well as their application of the segregability requirement, the Court shall confine its discussion to those objections raised by Plaintiff.

C.     *Defendants Have Not Carried Their Burden With Respect to FOIA Exemption 4*

Defendants have withheld documents in whole or in part on the basis of FOIA Exemption 4, which applies to "trade secrets and commercial or financial information obtained from a person and privileged or confidential."  5 U.S.C. 552(b)(4).  Plaintiff only challenges Defendants' application of Exemption 4 to "the incentive payments for the contractor and the answers to NIH questions in the revised contract proposal."  Pls.' Cross. Mot. for Summ. J. at 18; V.I. at 10 (Document 11), 12 (Document 13).  As such, the Court shall focus its attention on Defendants' application of FOIA Exemption 4 to this information as contested by Plaintiff.

Here, neither party contends that the requested information is a trade secret and thus the Court must look to the second kind of information protected under Exemption 4.  The second type of information protected by FOIA's fourth exemption is information that is 1) commercial or financial, 2) obtained from a person outside the government, *and* 3) privileged or confidential.  *Gulf & W. Indus. v. United States,* 615 F.2d 527, 529 (D.C. Cir. 1979).  It is undisputed that the information that Plaintiff wishes to obtain is commercial or financial information.  Second, the information must be obtained from a person.  There is no doubt that a corporation may be considered a "person" for the purposes of exemption 4.  5 U.S.C. 551(2).  *See, e.g.*, *Allnet Commc'n Servs., Inc. v. FCC*, 800 F. Supp. 984, 988 (D.D.C. 1992) ("'[P]erson' refers to a wide range of entities including corporations, associations and public or private organizations other than agencies.").  However, the scope of Exemption 4 is "restricted" to information that has "not been generated within the Government."  *Bd. of Trade v. Commodity Futures Trading Comm'n*, 627 F.2d 392, 405 (D.C. Cir. 1980).  Third, withheld information must be "privileged or confidential."  Ordinarily, to determine whether information is confidential, this Court must first determine whether the requested information was submitted voluntarily or whether its submission was required.  *McDonnell Douglas Corp. v. NASA*, 180 F.3d 303, 304 (D.C. Cir. 1999).  If the information was submitted voluntarily, then the information is "confidential for the purpose of Exemption 4 if it is of a kind that would customarily not be released to the public by the person from whom it was obtained."  *Critical Mass III*, 975 F.2d at 879.  If the government requires the submission of information, then the information is "confidential" if it 1) impairs the government's ability to obtain necessary information in the future, or 2) causes substantial harm to the competitive position of the person from whom the information was obtained.  *McDonnell*

*Douglas*, 180 F.3d at 305 (citing *Nat'l Parks & Conservation Ass'n v. Morton*, 498 F.2d 765

(D.C. Cir. 1974) (*National Parks I*)).

With respect to the incentive payments, Plaintiff argues that while they constitute

commercial or financial information, "this is agency information provided by NIH in its contract

with the contractor" such that it is neither "obtained from a person," nor consequently "privileged

or confidential."  Pls.' Cross Mot. for Summ. J. at 19.  Defendants argue that "[r]elease of future

contract prices and incentive amounts could result in commercial harm to the contractor in that

these figures represent amounts not yet paid and perhaps never to be paid."  Cornell Decl. ¶ 10.

*See* Defs.' Mem. for Part. Summ. J. at 18-19.  Furthermore, Defendants assert that "the amount is

a negotiated outcome between NIH and its contractor."  Defs.' Opp'n at 5.

In *Public Citizen Health Research Group v. NIH*, 209 F. Supp. 2d 37 (D.D.C. 2002), this

Court held that the fact that a financial amount is arrived at through negotiation with the

government does not preclude a finding that a person is the source of such information:

> Even though the final royalty rate is arrived at through negotiation, Freire Decl. ¶ 12, this does not alter the fact that the licensee is the ultimate source of this information. Documents that contain "summaries or reformulations of information supplied by a source outside of the government" are protected under exemption 4.  *Judicial Watch, Inc. v. Export-Import Bank,* 108 F. Supp. 2d 19, 28 (D.D.C. 2000) (citing *Gulf and W. Indus.,* 615 F.2d at 529-30).  In this case, the royalty rate is the rate embodied in an agreement that the licensee agrees to pay to Defendant.  It is the rate *provided by the licensees* to the NIH in the royalty arrangements.  If the licensee wishes to become involved with a certain technology, it must submit proposed royalty information.  If it fails to submit any information it cannot license the technology.  While the final royalty rates may reflect negotiation between the agency and the licensee, the licensee still must provide the information in the first instance.  Therefore, the Court finds that the agency obtained this information from a person within the meaning of exemption 4.

*Id.* at 44-45.  Incentive payments that the government will provide to a contractor for meeting

certain goals, however, can be distinguished from a royalty rate that a licensee must provide to

the government, in that the latter requires an assessment of the technology used by the licensee as

a basis for the negotiation. *See id.* at 40.  Furthermore, as set forth in the facts of *Public Citizen*,

a licensee is *required* to pay royalties to NIH in order to receive a license such that a figure must

be agreed upon.  *See id.* ("[t]he licenses require the payment of royalties to the NIH as

consideration for the right to use the patented technology.  The royalties are negotiated on a case

by case basis and are dependent upon the nature of the technology being used." (internal citations

omitted)).  In the instant case, the incentive award amounts are the amounts that NIH agrees to

pay to the contractor, not the other way around, although negotiated by both parties.  The Court

concludes that the incentive award amounts requested by Plaintiff were not "obtained from a

person" such that FOIA Exemption 4 is inapplicable, as Defendants have nowhere demonstrated

that the contractor was the source of the information in the first instance and not the agency.

Moreover, Defendants do not address whether the contractor was required to submit information

with respect to the incentive award amounts or did so voluntarily.  *See McDonnell Douglas*

*Corp. v. U.S. Dep't of the Air Force*, 375 F.3d 1182, 1187 (D.C. Cir. 2004) (holding that option

pricing was confidential and should have been withheld pursuant to Exemption 4 where it was

"undisputed" that the bidding party "was required to provide to the Air Force the option prices

and the information in the CLINs in order to compete for the contract.").  Furthermore,

Defendants have not provided any argument as to why whether or not such incentive amounts

were actually paid would have any bearing on the application of Exemption 4.  An agency, of

course, bears the burden of demonstrating the validity of any exemption that it asserts.  *See* 5

U.S.C. § 552(a)(4)(B).  Defendants have not met that burden here.

 With respect to the contractor's answers to questions received by NIH's Technical

Review Group, Plaintiff argues that Defendants' *Vaughn* index entry stating that the "answers

provided by CRL provide detailed business information that if released will put CRL at a

competitive disadvantage," (quoting V.I. at 12 (Document 13)) is simply a "bald assertion of

exemption" with respect to "voluntarily submitted records." Pls.' Cross Mot. for Summ. J. at 20.

However, the Court notes that Defendants explicitly drop this application of Exemption 4 in their

Opposition such that the Court concludes that Defendants have conceded the matter. *See* Defs.'

Opp'n at 5 (using the heading title "NIH Properly Applied FOIA Exemption 4 *to the Amount of

Contractor Incentive Awards*" (emphasis added)). Accordingly, Defendants cannot apply

Exemption 4 to the "incentive payments to the contractor and the answers to NIH questions in

the revised contract proposal."

  D.  *Defendants Have Not Carried Their Burden With Respect to FOIA Exemption 5*

  Defendants have withheld documents in whole or in part on the basis of FOIA Exemption

5 pursuant to the deliberative process privilege. Plaintiff only challenges Defendants' application

of the deliberative process privilege to "the amounts of the incentive payments offered to the

contractor in the APF contract and the withheld NIH contract questions." Pls.' Cross Mot. for

Summ. J. at 20; V.I. at 10 (Document 11), 12 (Document 13). As such, the Court shall focus its

attention on Defendants' reliance on the deliberative process privilege within FOIA Exemption 5

to the information contested by Plaintiff.

  Exemption 5 permits the withholding of "interagency or intra-agency memorandums or

letters which would not be available by law to a party other than an agency in litigation with the

agency." 5 U.S.C. § 552(b)(5). Courts have "construed this exemption to encompass the

protections traditionally afforded certain documents pursuant to evidentiary privileges in the civil

discovery context," including "materials which would be protected under the attorney-client privilege, the attorney work-product privilege, or the executive 'deliberative process privilege." *Taxation With Representation Fund v. IRS,* 646 F.2d 666, 676 (D.C. Cir. 1981) ("*TWRF* ") (citations omitted).  *See also Tax Analysts*, 294 F.3d at 76.

The deliberative process privilege covers "documents reflecting advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and polices are formulated."  *NLRB v. Sears, Roebuck & Co.,* 421 U.S. 132 150, 95 S. Ct. 1504, 44 L. Ed. 2d 29 (1975).  In contrast, final statements of agency policy or statements explaining actions already taken by an agency are not protected by the deliberative process privilege.  *Tax Analysts*, 294 F.3d at 80.  Three policy purposes constitute the basis for this privilege: (1) to encourage open, frank discussions on matters of policy between subordinates and superiors; (2) to protect against premature disclosure of proposed policies before they are finally adopted; and (3) to protect against the public confusion that might result from disclosure of reasons and rationales that were not in fact ultimately the grounds for an agency's action.  *See Coastal States,* 617 F.2d at 866.

"The deliberative process privilege protects agency documents that are both predecisional and deliberative."  *Judicial Watch, Inc.*, *v. FDA*, 449 F.3d 141, 151 (D.C. Cir. 2006).  To invoke the privilege, the document must both be (1) predecisional in that it was "generated before the adoption of agency policy" and (2) deliberative in that it "reflects the give-and-take of the consultative process."  *Coastal States,* 617 F.2d at 866; *see also Tax Analysts v. IRS,* 117 F.3d 607, 616 (D.C. Cir. 1997); *Judicial Watch, Inc., v. Dep't of Energy*, 412 F.3d 125, 129 (D.C. Cir. 2005).  "In other words, it protects 'predecisional communications' reflecting an agency's

30

internal deliberations, but not communications that explain a decision that has already been made.'" *Tax Analysts*, 294 F.3d at 80 (quoting *Sears*, 421 U.S. at 151-52, 95 S. Ct. 1504). "The exemption thus covers recommendations, draft documents, proposals, suggestions, and other subjective documents which reflect the personal opinions of the writer rather than the policy of the agency. Documents which are protected by the privilege are those which would inaccurately reflect or prematurely disclose the views of the agency, suggesting as agency position that which is as yet only a personal position." *Coastal States*, 617 F.2d at 866. However, "an agency will not be permitted to develop a body of 'secret law,' used by it in the discharge of its regulatory duties and in its dealings with the public, but hidden behind a veil of privilege, because it is not designated as 'formal,' 'binding,' or 'final.'" *Id*. at 867. Exemption 5 does not "protect communications that implement an established policy of an agency." *TWRF*, 646 F.2d at 677. The Court also notes that "even if the document is predecisional at the time it is prepared, it can lose that status if it is adopted, formally or informally, as the agency position on an issue or is used by the agency in its dealings with the public." *Coastal States*, 617 F.2d at 867.

Finally, in determining whether a document represents "working law" of an agency subject to disclosure, the Court considers "the function and significance of the document in the agency's decisionmaking process," "the nature of the decisionmaking authority vested in the office or person issuing the disputed document," and "the flow of documents" in determining whether Exemption 5 properly applies. *TWRF*, 646 F.2d at 678, 679, 681. "Under the FOIA, 'working law' must be disclosed whether or not those who use the working law make the final decisions about program implementation." *Tax Analysts*, 294 F.3d at 283.

In applying Exemption 5 to incentive amounts, Defendants conclude that, "[p]rojected

incentive percentage and dollar amount of proposed incentive payments are pre-decisional in that they have not been paid and may never be paid.  All actual amounts paid out were released."  Cornell Decl. ¶ 11.  However, the Court agrees with Plaintiff's assessment that "NIH does not even argue that the figures are 'deliberative.'  In any case, these fixed, dollar amount numbers do not reflect the 'give-and-take of the consultative process' within the agency."  Pls.' Cross Mot. for Summ. J. at 21 (quoting *Coastal States*, 617 F.2d at 866).  Additionally, as the Court understands that such amounts were made known to the contractor, disclosure to an outside party precludes application of Exemption 5.  *Mead Data Central, Inc. v. U.S. Dept. of Air Force*, 566 F.2d 242, 257 (D.C. Cir. 1977) ("Predecisional materials are not exempt merely because they are predecisional; they must also be a part of the deliberative process within a government agency. . . . Information about the 'deliberative' or negotiating process outside an agency, between itself and an outside party, does not [fall within Exemption 5].").  With respect to the questions posed to the contractor, the Court also agrees that "Exemption 5 . . . cannot be applied to this information because it involves agency information that was disclosed to an outside party."  Pls.' Cross Mot. for Summ. J. at 22.

While Defendants cite to *Quarles v. Department of the Navy* and *Cooper v. Department of the Navy* in their Opposition, neither of these cases suggests that Defendants can appropriately invoke Exemption 5 in this case.  *See* Defs.' Opp'n at 6-7 (citing *Quarles v. Dep't of the Navy*, 893 F.2d 390, 392-93 (D.C. Cir. 1990); *Cooper v. Dep't of the Navy*, 558 F.2d 274, 278 (5th Cir. 1977)).  The cost estimates at issue in *Quarles* were never disclosed to a non-agency party.  *See generally Quarles*, 893 F.2d 390.  And in *Cooper,* which is not precedential in this Circuit, the Fifth Circuit made the very limited holding that "a limited and proper use of [a safety

investigation] report for accident prevention purposes should [not] work destruction of the confidentiality promised in assembling it and permit its use for the very purposes those whose disclosures made it possible were promised it would not be used for."  *Cooper*, 558 F.2d at 278. Defendants have not suggested that any such purposes are at stake with respect to the incentive amounts or NIH questions at issue here.

Accordingly, Defendants cannot apply Exemption 5 to the "the amounts of the incentive payments offered to the contractor in the APF contract and the withheld NIH contract questions."

E.       *Defendants Have Not Carried Their Burden With Respect to FOIA Exemption 6*

Defendants have withheld documents in whole or in part on the basis of FOIA Exemption 6, which applies to "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy."  Plaintiff only challenges Defendants' application of Exemption 6 with respect to "redactions of the square footage of the APF, daily inventories of animals, floor plans and wiring diagrams, specific locations of individual animals, locations of animal records and specimens, numbers of rooms containing equipment, the numbers of animals in specific holding areas, and the square footage of specific areas."  Pls.' Cross Mot. for Summ. J. at 22; V.I. at 38, 40, 48, 102, 103.  As such, the Court shall focus its attention on the applications of Exemption 6 contested by Plaintiff.

In withholding documents pursuant to Exemption 6, 5 U.S.C. § 552(b)(6), an agency must balance the public's interest in disclosure with the privacy interest of an individual since it allows the withholding of "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy."  5 U.S.C. § 552(b)(6); *see Nat'l Archives and Records Admin. v. Favish*, 541 U.S. 157, 171, 124 S. Ct. 1570, 158 L. Ed. 2d

319 (2004); *U.S. Dep't of Justice v. Reporters Comm. for Freedom of the Press*, 489 U.S. 749,

773-75, 109 S. Ct. 1468, 103 L. Ed. 2d 774 (1989).  Exemption 6 protects from disclosure all

information that "applies to a particular individual" in the absence of a public interest in

disclosure.  *U.S. Dep't of State v. Washington Post Co.*, 456 U.S. 595, 602, 102 S. Ct. 1957, 72

L. Ed. 2d 358 (1982) ("In sum, we do not think that Congress meant to limit Exemption 6 to a

narrow class of files containing only a discrete kind of personal information.  Rather, the

exemption was intended to cover detailed Government records on an individual which can be

identified as applying to that individual." (internal quotation and citation omitted)).  Courts have

broadly interpreted the term "similar files" to include most information applying to a particular

individual.  *Kidd v. Dep't of Justice*, 362 F. Supp. 2d 291, 296 (D.D.C. 2005).  It is not the nature

of the files in which the information was contained, but the balance of public and private

interests that determines the exemption's scope.  *Washington Post*, 456 U.S. at 599-600, 102 S.

Ct. 1957.

Ms. Cornell's Declaration states as follows with respect to NIH's application of

Exemption 6:

> NIH redacted daily inventory of animals and total square footage of APF, because release
> of the information will cause unwarranted invasion of the personal privacy of the animal
> care workers.  Animal care workers at this and other facilities have received specific and
> detailed threats to their safety.  Individuals with intent to harm animal care workers would
> be able to target the location with the greatest concentration of workers if this information
> is released."

Cornell Decl. ¶ 12.  *See also* Defs.' Mot. for Part. Summ. J. at 28.   Noting that "IDA is not

challenging the redactions of home addresses and telephone numbers of staff personnel," Pls.'

Cross Mot. For Summ. J. at 23 n.20, Plaintiff argues that Defendants' "redactions are improper

because the information withheld by NIH is not about any individual person." *Id.* at 23.

Defendants' argument does not address the fundamental fact that the information sought by Plaintiff does not itself disclose any personal, individualized information such that Exemption 6 would properly apply. The Supreme Court made clear that

> [t]his construction of Exemption 6 will not render meaningless the threshold requirement that information be contained in personnel, medical, and similar files by reducing it to a test which fails to screen out any information that will not be screened out by the balancing of private against public interests. As petitioners point out, there are undoubtedly many Government files which contain information not personal to any particular individual, the disclosure of which would nonetheless cause embarrassment to certain persons. Information unrelated to any particular person presumably would not satisfy the threshold test.

*Washington Post Co.*, 456 U.S. at 602 n.4, 102 S. Ct. 1957. The information requested by Plaintiff will simply not reveal any information that even tangentially points to specific individuals. While the instant Circuit in *Nat'l Assoc. of Home Builders v. Norton*, 309 F.3d 26, 33-37 (D.C. Cir. 2003), balanced public against private interests in determining whether records containing pygmy owl locations which might allow for the identification of individual property owners and notably concluded that such documents could not be withheld pursuant to Exemption 6 ("[t]he Secretary has established only the speculative potential of a privacy invasion without any degree of likelihood," *id.* at 385), Defendants have not suggested that daily inventories of animals and other requested documents will reveal any information about any individuals such that balancing is not appropriate in this case. Defendants' concerns about animal care workers' safety are not properly incorporated via Defendants' application of Exemption 6 to the material in question. As Defendants have proffered no other basis under FOIA for their exclusion, the Court shall order Defendants to provide to Plaintiff the withheld "redactions of the square

35

footage of the APF, daily inventories of animals, floor plans and wiring diagrams, specific

locations of individual animals, locations of animal records and specimens, numbers of rooms

containing equipment, the numbers of animals in specific holding areas, and the square footage

of specific areas."

      *F.*      *Release of Reasonably Segregable Factual Material*

Defendants may properly withhold certain materials under FOIA's enumerated

exemptions; however they must release "any reasonably segregable portions" of responsive

documents once they have redacted the exempted information. *See* 5 U.S.C. § 552(b).  The

segregability requirement is of such great import that this Court has an affirmative duty to engage

in its own segregability analysis, regardless of Plaintiff's pleadings. *See Billington v. Dep't of*

*Justice*, 233 F.3d 581, 586 (D.C. Cir. 2000).  While the segregability analysis is necessary, not all

material is amenable to segregation.  The United States Court of Appeals for the District of

Columbia Circuit has long held that non-exempt information may be withheld if it is

"inextricably intertwined" with exempt information. *See Trans-Pacific Policing Agreement*, 177

F.3d at 1027 (quoting *Mead Data*, 566 F.2d at 260).

The Court will address Plaintiff's segregability challenge of Documents 13, 14, and 15 on

pages 12-13 of the *Vaughn* Index. Pls.' Cross Mot. for Summ. J. at 26.  As the Court has ordered

that the requested information in Document 13 must be released to Plaintiff based on

Defendants' failure to sustain its burden in applying Exemptions 4 and 5 thereto, the Court will

address Plaintiff's argument with respect to Documents 14 and 15.  According to Plaintiff:

      Document 14 purportedly contains 35 pages of otherwise unidentified
   '[s]ubcontractor and vendor invoices." Document 15 purportedly consists of 5 pages of
   otherwise unidentified "Emails and misc. documents regarding the purchasing of

equipment" for the APF.  *Id.*  NIH invoked Exemptions 4 and 5 to withhold the names of subcontractors and vendors and estimated costs in order to avoid "commercial harm" to the contractor and the government.  *Vaughn* Index at 12-13.  Assuming, *arguendo*, that is correct, there still is no basis for withholding the subject matter of the invoices and e-mails.  Knowing what supplies and equipment are needed or obtained for the facility will shed light on the conditions at the APF as well as performance of this contract.  NIH did not explain why it did not separate this information but instead lumped all these pages together and offered its conclusory justification without addressing the underlying subject matter of the documents.

Pl.'s Cross Mot. for Summ. J. at 26-27.  Plaintiff's segregability arguments are not refuted in any way by Defendants in their Opposition such that the Court considers Plaintiff's arguments on the matter to be conceded.  Analyzing the issue on the merits, the Court also agrees that the subject matter of invoices and e-mails is, on the basis of the information before the Court, not properly subject to FOIA Exemption 4 or 5.  Accordingly, the Court orders Defendants to provide redacted copies of Documents 14 and 15 to Plaintiff that meet Defendants' duty to segregate, including the subject matter of the invoices and e-mails.

G.      *Public Interest Fee Waiver Request*

In general, "a FOIA requester must pay reasonable costs for the search, review, and duplication of the records sought."  *Judicial Watch, Inc. v. U.S. Dep't of Transp.*, Civ. No. 02-566, 2005 WL 1606915, at *3 (D.D.C. July 7, 2005) (citing 5 U.S.C. § 552(a)(4)(A)(ii)(I)).  However, an agency must waive or reduce fees for search, review, or duplication of documents if (1) "disclosure of the information is in the public interest because it is likely to contribute significantly to public understanding of the operations or activities of the government" and (2) "is not primarily in the commercial interest of the requester."  5 U.S.C. § 552(a)(4)(A)(iii).  The FOIA requester bears the initial burden of proving that it meets both prongs.  *Judicial Watch*, 2005 WL 1606915 at *3 (citing *Larson v. CIA*, 843 F.2d 1481, 1483 (D.C. Cir. 1988)).  In

denying Plaintiff's request for a fee waiver, Defendants did not dispute Plaintiff's contention that

disclosure to IDA was not in the commercial interest of IDA, but did allege that Plaintiff failed to

demonstrate how disclosure of the information is likely to contribute significantly to the public's

understanding of the operations or activities of the government.  *See* Compl., Ex. 2 (NIH's Fee

Waiver Denial) at 1.  Therefore, the issue before the Court is whether the information sought by

Plaintiff would contribute significantly to the public's understanding of the operations or

activities of NIH.

In reviewing an agency's determination on a fee waiver issue, a district court must apply a

*de novo* standard of review and look only to the administrative record that was before the agency

at the time of its decision.  5 U.S.C. § 552(a)(4)(A)(vii); *D.C. Technical Assistance Org. v. U.S.*

*Dep't of Hous. & Urban Dev.*, 85 F. Supp. 2d 46, 48 (D.D.C. 2000).  According to legislative

history, the FOIA fee waiver provision "'is to be liberally construed in favor of waivers for

noncommercial requesters.'"  *McClellan Ecological Seepage Situation v. Carlucci*, 835 F.2d

1282, 1284 (9th Cir. 1987) (quoting 132 Cong. Rec. 27, 90 (1986) (Sen. Leahy)).  To determine

whether a fee waiver request involves documents that will contribute to a greater public

understanding of government activities, a court must look to the following four factors set forth

in the Department of Health and Human Services Freedom of Information regulations:

> (1) How, if at all, do the records to be disclosed pertain to the operations or activities of
> the Federal Government?
>
> (2) Would disclosure of the records reveal any meaningful information about government
> operations or activities?  Can one learn from these records anything about such operations
> that is not already public knowledge?
>
> (3) Will the disclosure advance the understanding of the general public as distinguished
> from a narrow segment of interested persons?  Under this factor we may consider whether

the requester is in a position to contribute to public understanding.  For example, we may consider whether the requester has such knowledge or expertise as may be necessary to understand the information, and whether the requester's intended use of the information would be likely to disseminate the information among the public.  An unsupported claim to be doing research for a book or article does not demonstrate that likelihood, while such a claim by a representative of the news media is better evidence.

(4) Will the contribution to public understanding be a significant one?  Will the public's understanding of the government's operations be substantially greater as a result of the disclosure?

45 C.F.R. § 5.45(b); *see also Judicial Watch, Inc. v. Rossotti*, 326 F.3d 1309, 1312 (D.C. Cir. 2003).  Additionally, fee waiver requests must be made with 'reasonable specificity,' *Larson*, 843 F.2d at 1483, and contain more than 'conclusory allegations,' *Nat'l Treasury Employees*, 811 F.2d at 647.

The first factor–whether the subject matter of the requested documents specifically relates to operations or activities of the government–weighs in favor of granting Plaintiff's fee waiver. With "reasonable specificity," Plaintiff requested operational records for the Alamogordo Primate Facility, which is owned by the NIH, and records relating to certain APF chimpanzees, which are also owned by NIH.  Compl., Ex. 1 (FOIA Request)) at 2-5.  Both categories of records relate to the NIH's operation of APF and its activities relating to the maintenance and care of the chimpanzees.  Therefore, based on Plaintiff's fee waiver request, the subject matter of the requested documents relates to the activities and operations of the NIH.

In reviewing the second factor–whether the requested documents will be likely to "reveal any meaningful information" about government activities or operations–it is relevant to consider the objectives and reasons given by the requester in support of the waiver.  *Judicial Watch*, 2005 WL 1606915 at *4; *D.C. Technical Assistance Org.*, 85 F. Supp. 2d at 48-49 (citing *McClain v.*

39

*U.S. Dep't of Justice*, 13 F.3d 220, 220-21 (7th Cir. 1993).  Plaintiff's waiver request

demonstrates Plaintiff's intention to analyze the requested records and "share the requested

documents and the results of IDA's analysis of those documents with the general public" in order

to "shed light on the NIH's oversight and management of the care of the chimpanzees at the

APF."  Compl., Ex. 1 (FOIA Request)) at 6.  Furthermore, Plaintiff describes the informative

value of the disclosure of these documents, as "help[ing] the public understand the degree to

which the NIH is fulfilling its duties under the Animal Welfare Act and the [Public Health

Service (PHS)] Policy for the Humane Care and Use of Laboratory Animals, particularly when

the NIH is confronted with chimpanzee deaths and injuries . . . ."  *Id.*  Plaintiff's explanation is

reasonably specific regarding its intentions to educate the public about NIH operations.

Therefore, the Court disagrees with Defendants' argument that Plaintiff has failed to demonstrate

that the requested documents will be likely to contribute to an understanding of the NIH's

operations or activities.  Therefore, the second factor weighs in favor of granting Plaintiff's fee

waiver request, as it is likely that the records requested would reveal "any meaningful

information" about NIH operations or activities.

     The third factor–whether the disclosure will contribute to a greater understanding on the

part of the public at large–turns on the scope of the requester's proposed dissemination–whether

to a large segment of the public or a limited subset of persons, *Carney*, 19 F.3d at 815, how the

requester will convey the information to the general public, *Rossotti*, 326 F.3d at 1312, and the

requestor's capacity to effectively convey the information to the public, *Judicial Watch*, 2005

WL 1606915 at *5 (citing *Rossotti*, 326 F.3d at 1312).  Plaintiff states in its fee waiver request

that its methods of disseminating the requested information to the public will include IDA's

"web sites, alerts, newsletters and [its] network of other national and international media contacts."  Compl., Ex. 1 (FOIA Request)) at 6.  Furthermore, Plaintiff informs Defendants that it uses its web site and associated sites which receive over 55,000 hits per day and over 1.6 million hits per month, "to disseminate breaking news regarding animal welfare and various FOIA-related information" and that IDA uses its quarterly newsletter, which "reaches over 65,000 people in all 50 states and abroad," to publish its analyses of FOIA information relating to government oversight of animal research.  Compl., Ex. 1 (FOIA Request)) at 5.  Based on Plaintiff's description of the methods it will use to disseminate the requested information and the scope of those methods, the Court disagrees with Defendants' contention that Plaintiff failed to demonstrate that the requested information would be widely distributed.  Case law has consistently found these dissemination methods sufficiently broad to demonstrate that the disclosure of requested information will contribute to a greater understanding on the part of the public at large.  *See Forest Guardians v. U.S. Dep't of Interior*, 416 F.3d 1173, 1180 (10th Cir. 2005) (holding that requester's intention to establish website containing the requested information and publishing the information in a newsletter, which is e-mailed to over 2,500 people, was sufficient to show that the requested information would likely contribute to the public's understanding of government activities).  Furthermore, courts have held that "[i]nformation need not actually reach a broad cross-section of the public in order to benefit the public at large."  *Carney*, 19 F.3d at 815.

The Court also finds no basis for Defendants' argument that Plaintiff failed to demonstrate "a unique capability to educate the public beyond [IDA's] constituency and similar groups that have the same concerns."  Compl., Ex. 2 (Fee Waiver Denial)) at 1.  IDA explained

41

in great detail how it has disseminated information it received from FOIA requests to regulatory agencies, the public and Congress, and how IDA's dissemination efforts "led to major discoveries of violations and significant agency involvement to curtail the abuses."  Compl., Ex. 1 (FOIA Request)) at 9.  Plaintiff's account of how its dissemination of information relating to The Coulston Foundation's operation of APF prompted the USDA and FDA to take unprecedented actions against The Coulston Foundation demonstrates, with reasonable specificity, Plaintiff's ability to disseminate FOIA disclosures to the public.  Additionally, Plaintiff's account of its dissemination regarding Coulston illustrates Plaintiff's ability to understand and process such information as well as a history of dissemination.  *Cf. McClellan*, 835 F.2d at 1286 (holding that requesters failed to demonstrate their ability to disseminate the requested information because their fee waiver request gave no indication of their ability to understand and process the requested information, and did not reveal whether requesters had a history of disseminating such information).  Defendants give no indication as to how Plaintiff's description falls short of demonstrating Plaintiff's dissemination ability.  Accordingly, the Court concludes that Plaintiff's description of its dissemination methods and history demonstrate that the disclosure will contribute to a greater understanding on the part of the public at large. *Judicial Watch*, 2005 WL 1606915 at *5 (holding that requesting party "met the third factor by detailing its ability to publicly disseminate information received") (citing *Rossotti*, 326 F.3d at 1314).

        In determining whether Plaintiff satisfies the fourth factor–whether disclosure of the requested documents will contribute significantly to the public's understanding of government activities or operations–courts have considered whether the requested information is already

available to the general public.  *Rossotti*, 326 F.3d at 1312.  While it is possible, as Defendants

assert, that some of the requested information is already available to the public, Defendants do

not indicate which of the requested records are publicly available.  It is unlikely that the

chimpanzee medical records are part of the documents that Defendant alleges are available to the

public.  Furthermore, even if some of the requested information is available to the public upon

request, courts have been reluctant to treat information that is technically available, through a

reading room or upon a FOIA request, as part of the public domain.  *See Carney*, 19 F.3d at 815

(holding that "the mere fact that particular records have been released to other requesters does

not mean that the information contained in the records is readily available to the public);

*Fitzgibbon v. Agency for Int'l Dev.*, 724 F. Supp. 1048, 1051 (D.D.C. 1989) (holding that records

were not in public domain merely because they were available in agency's public reading room).

Therefore, the Court finds Defendants' argument unconvincing that "[m]uch of the information

requested is readily available to the public upon request, and on the NIH website."  Compl., Ex. 4

(NIH's Appeal Decision)) at 2.

Additionally, the Court is unconvinced by Defendants' statement that disclosure would

not reveal any meaningful information about government operations or activities that is not

already public knowledge.  Plaintiff demonstrated how its public dissemination of information

regarding The Coulston Foundation brought to light information that had not been formerly

communicated to the public.  Compl., Ex. 1 (FOIA Request)) at 9.  Based on Plaintiff's account,

it is not unlikely that Plaintiff's current document request relating to APF since CRL took over

operation of APF will also contribute to the public's knowledge regarding NIH's activities or

operations.  Finally, even if some of the requested information is available to the public upon

request, Plaintiff plans to broadly disseminate its compiled information, through newsletters,

alerts, and its website.  Therefore, Plaintiff's goals for dissemination are "qualitatively different

from and exponentially greater than the existing availability of the information" sought by IDA.

*Forest Guardians*, 416 F.3d at 1181.  Accordingly, this Court concludes that the contribution of

the requested documents to the public's understanding of the operations or activities of NIH is

likely to be significant.  The Court shall therefore deny in part Defendants' Motion for Partial

Summary Judgment and grant in part Plaintiff's Cross-Motion for Summary Judgment on the

issue of Plaintiff's public interest fee waiver request.

H.      *NIH's Referral of Documents to the U.S. Department of Army*

After discovering that twenty-three pages of records responsive to Plaintiff's FOIA

request originated with the USAF, Defendants referred the request for those records to the USAF

on August 3, 2004, and notified Plaintiff of this referral in Defendants' January 11, 2005 letter.

Defs.' Mot. for Partial Summ. J., Ex. A (January 11, 2005 Response) at 2.  Defendants move for

summary judgment regarding these documents, on the grounds that Defendants released the

twenty-three pages at issue to Plaintiff on May 4, 2005, and therefore fulfilled their duties under

FOIA.  Defs.' Mem. in Supp. of Second Mot. for Partial Summ. J. at 1-2.

An agency possessing records that originated from another government agency may refer

those records to the originating agency for determination as to whether those documents should

be released under FOIA.  *Sussman v. U.S. Marshall Serv.*, Civ. No. 03-610, 2005 WL 3213912,

at *10 (D.D.C. Oct. 13, 2005) (citing *McGehee v. CIA*, 697 F.2d 1095, 1110 n.71 (D.C. Cir.

1983)).  Where an agency refers documents to their original agency, the Court must determine if

the referral was justified or whether the referral resulted in the improper withholding of

44

documents. *Peralta v. U.S. Att'y's Office*, 136 F.3d 169, 175 (D.C. Cir. 1998). Plaintiff

contends that, even though Defendants eventually released the USAF documents, the Court

should find that Defendants "improperly delayed and withheld agency records." Pl.'s Resp. to

Second Mot. for Partial Summ. J. at 5.

The Court refuses to find an improper withholding or delay on two grounds. First, this

Circuit has established that a defending agency in a FOIA case is entitled to summary judgment if

"the defending agency [can] prove that each document that falls within the class requested either

has been produced, is unidentifiable or is wholly exempt from the Act's inspection

requirements." *Weisberg v. U.S. Dep't of Justice*, 627 F.2d 365, 368 (D.C. Cir. 1980) (internal

citations and quotations omitted). Defendants in the present case have demonstrated that the

twenty-three pages at issue were produced. Therefore, it follows from *Weisberg* that Defendants

are entitled to summary judgment. *Id.* Second, this Court has held that "however fitful or

delayed the release of information under the FOIA may be, once all requested records are

surrendered, federal courts have no further statutory function to perform." *Perry v. Block*, 684

F.2d 121, 125 (D.C. Cir. 1982); *see also Anderson v. U.S. Dep't of Health & Human Servs.*, 3

F.3d 1383, 1384 (10th Cir. 1993) (holding that "[o]nce the government produces all the

documents a plaintiff requests, her claim for relief under the FOIA becomes moot"). Therefore,

even if Defendants' release of the USAF documents subjected Plaintiff to delay before producing

the records, this Court cannot make a finding of improper delay or withholding of documents

because the issue has become moot. Accordingly, the Court grants Defendants' Second Motion

for Partial Summary Judgment.

## IV. CONCLUSION

For the aforementioned reasons, the Court shall GRANT in part and DENY in part [11] Defendants' Motion for Partial Summary Judgment; GRANT in part and DENY in part [13] Plaintiff's Cross-Motion for Summary Judgment; and GRANT [17] Defendants' Second Motion for Partial Summary Judgment.  Defendants shall produce the following information to Plaintiff: 1) incentive payments to the contractor; 2) answers to NIH questions in the revised contract proposal; 3) the withheld NIH contract questions; and 4) redactions of the square footage of the APF, daily inventories of animals, floor plans and wiring diagrams, specific locations of individual animals, locations of animal records and specimens, numbers of rooms containing equipment, the numbers of animals in specific holding areas, and the square footage of specific areas.  Defendants shall also provide Plaintiff with properly-segregated, redacted versions of Documents 14 and 15 as listed in the *Vaughn* Index, including the subject matter of the invoices and e-mails at issue.  Defendants shall search APF for the requested clinical chimpanzee files, using a search cut-off date not earlier than March 31, 2007 and informing Plaintiff of said cut-off date.  Defendants shall further grant Plaintiff a public interest fee waiver immediately.  An Order accompanies this Memorandum Opinion.

Date:   April 14, 2008


_____/s/_____
COLLEEN KOLLAR-KOTELLY
United States District Judge